**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AT&T WIRELESS PCS,
INCORPORATED; PRIMECO PERSONAL
COMMUNICATIONS, L.P.; LYNNHAVEN
UNITED METHODIST CHURCH,
Plaintiffs-Appellees,

v.

CITY COUNCIL OF THE CITY OF
VIRGINIA BEACH,
Defendant-Appellant.

No. 97-2389

VIRGINIA ASSOCIATION OF COUNTIES,
Amicus Curiae.

AT&T WIRELESS PCS,
INCORPORATED; PRIMECO PERSONAL
COMMUNICATIONS, L.P.; LYNNHAVEN
UNITED METHODIST CHURCH,
Plaintiffs-Appellants,

v.

CITY COUNCIL OF THE CITY OF
VIRGINIA BEACH,
Defendant-Appellee.

No. 97-2513

VIRGINIA ASSOCIATION OF COUNTIES,
Amicus Curiae.

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-97-391-2)

Argued: June 2, 1998

Decided: September 1, 1998

Before WILKINS and LUTTIG, Circuit Judges, and
FABER, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Reversed in part and affirmed in part by published opinion. Judge
Luttig wrote the opinion, in which Judge Wilkins and Judge Faber
joined.

_____

**COUNSEL**

**ARGUED:** Lawrence Steven Emmert, Senior Assistant City Attor-
ney, OFFICE OF THE CITY ATTORNEY, Virginia Beach, Virginia,
for Appellant. F. Bradford Stillman, MCGUIRE, WOODS, BATTLE
& BOOTHE, Norfolk, Virginia, for Appellees. **ON BRIEF:** William
M. Macali, Deputy City Attorney, OFFICE OF THE CITY ATTOR-
NEY, Virginia Beach, Virginia; William R. Malone, MILLER &
VAN EATON, P.L.L.C., Washington, D.C., for Appellant. William
G. Broaddus, Robert W. McFarland, Douglas E. Miller, MCGUIRE,
WOODS, BATTLE & BOOTHE, Norfolk, Virginia; R. Edward
Bourdon, Jr., SYKES, CARNES, BOURDON & AHERN, P.C., Vir-
ginia Beach, Virginia, for Appellees. Howard W. Dobbins, Elizabeth
P. Mason, WILLIAMS, MULLEN, CHRISTIAN & DOBBINS, Rich-
mond, Virginia, for Amicus Curiae.

_____

**OPINION**

LUTTIG, Circuit Judge:

This case arises under the federal Telecommunications Act of
1996. The district court ordered appellant, the City Council of Vir-
ginia Beach, Virginia, to approve appellees' application to erect com-

munications towers in a residential area of Virginia Beach, holding that the City Council violated section 704(c)(7)(B) of the Telecommunications Act by denying the application. We hold that the City Council did not violate section 704(c)(7)(B), and therefore we reverse the judgment of the district court.

I.

On March 25, 1997, the City Council of Virginia Beach ("City Council") voted unanimously to deny the application of appellees AT&T Wireless PCS ("AT&T") and PrimeCo Personal Communications ("PrimeCo"), and others, for a conditional use permit to erect two 135-foot communications towers at the Lynnhaven Methodist Church ("Church") in the Little Neck Peninsula area of Virginia Beach. Little Neck is a heavily wooded residential area with no significant commercial development, no commercial antenna towers, and no above-ground power lines. Little Neck is zoned R-20 Residential under the Virginia Beach Zoning Ordinance, a classification that aims to "provide for harmonious neighborhoods located as to create compatibility and to provide for certain other necessary and related uses within residential communities but limited so as to maintain neighborhood compatibility."

The City Council's vote concluded a months-long effort by appellees to secure a location for towers in Little Neck. AT&T and PrimeCo both offer digital wireless personal communications services in the Virginia Beach area. Digital service is considered an advance over analog service. Like analog service, it relies on overlapping "cells," each centered on a communications tower. However, because digital signals are weaker than analog signals, and because of the thick tree cover in Little Neck, AT&T and PrimeCo found that their Virginia Beach service had a "hole" in portions of Little Neck. Aided by City staff, they investigated several possible tower sites in Little Neck and concluded that the Church's property was the most desirable. They therefore entered into leases with the Church allowing them, in exchange for approximately $60,000 annual rent, to construct, maintain, and operate two 135-foot communications towers on the Church's property. Besides carrying digital signals, the towers were also to provide analog signals for GTE Mobile Net and 360o Communications (not parties to this case), who also sought to

3

enhance their service in Little Neck. Each tower would serve one ana-
log and one digital provider.

Virginia Beach's Zoning Ordinance required the Church to secure
a conditional use permit to allow AT&T and PrimeCo to build their
towers. Accordingly, the Church filed an application with the City
Planning Department, which, after making some modifications to
appellees' proposal, recommended approval to the City Planning
Commission. The Planning Commission then held a public hearing on
January 8, 1997. Representatives of the companies and of the Church
advocated approving the application, as did some commissioners and
city officials, but numerous area residents spoke against approval,
largely on the grounds that such a commercial use of the Church
property was improper in a residential area and that the towers, even
with various aesthetic modifications made by the companies, would
be eyesores. One resident submitted a petition in opposition, with
ninety signatures that he had collected in the day and a half prior to
the hearing. At the conclusion of the hearing, the Planning Commis-
sion voted unanimously, with one abstention, to recommend that the
City Council approve the application.

The City Council considered the application at its meeting on
March 25, 1997. Having been provided with copies of the Planning
Department's report, the transcript of the Planning Commission hear-
ing, and the various application materials, the City Council also heard
further testimony on the matter. Again, representatives of the compa-
nies and of the Church explained and supported the application;
numerous area residents spoke, all of those not affiliated with the
Church being opposed. One resident, Mr. Wayne Shank, presented
petitions with over seven hundred signatures in opposition. The Coun-
cil also appears to have had before it one shorter petition supporting
the application and various letters to councilmen on the matter, both
in support and in opposition. The only councilman to speak on the
merits, Councilman William Harrison (who represents Little Neck),
voiced his opposition in light of the testimony of area residents who
did not think that improved service was worth the burden of having
the towers looming over them.

The Council ultimately voted unanimously to deny the application,
a decision recorded both in a two-page summary of the minutes --

4

describing the application, listing the names and views of all who testified at the hearing, and recording the votes of each councilman -- and in a letter from the Planning Commission to the City Council describing the application and stamped with the word"DENIED" and the date of the City Council's vote. Consistent with its usual practice, the Council did not generate written findings of fact concerning its vote, nor did it produce a written explanation of the basis for its vote. In response to the denial, AT&T, PrimeCo, and the Church initiated this suit in federal district court in the Eastern District of Virginia. For the reasons we discuss below, the district court ordered the City Council to approve the application.

II.

Section 704(c)(7) of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, codified at 47 U.S.C.§ 332(c)(7), entitled "Preservation of local zoning authority," provides in relevant part as follows:

>　(A) <u>General Authority</u>
>
>　Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
>　(B) <u>Limitations</u>
>
>　(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--
>
>　(I) shall not unreasonably discriminate among providers of functionally equivalent services; and
>
>　(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>
>　. . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

Section (B)(v)**1** creates a cause of action for suits such as this one, if filed within thirty days of a State or local government's final action. AT&T and PrimeCo contend that the City Council, in denying the request for a conditional use permit, violated both subsections of (B)(i) as well as (B)(iii). The district court, ruling on cross-motions for summary judgment, held that the City Council (1) had unreasonably discriminated against appellees, in violation of subsection (B)(i)(I), (2) had not violated subsection (B)(i)(II)'s bar on prohibiting service, and (3) had failed to provide a "decision . . . in writing and supported by substantial evidence contained in a written record" in violation of section (B)(iii). 979 F. Supp. 416, 426-30 (E.D. Va. 1997). The court then ordered the City Council to approve the application.**2** Id. at 431.

For the reasons that follow, we reverse the district court's first holding, affirm the second, and reverse the third. There being no remaining material issues of fact, we order summary judgment in favor of the City Council on all three claims.

III.

The parties disagree vehemently as to the meaning of subsection (B)(i)(I)'s prohibition on "unreasonably discriminat[ing] among providers of functionally equivalent services." Appellant City Council would have us read into this language the traditional lenient standard

_____

**1** For the sake of simplicity and clarity, this opinion refers to the immediate subdivisions of section 704(c)(7)(B) as "section" and to the further subdivisions of section 704(c)(7)(B)(i) as "subsection," and also generally omits "704(c)(7)." Thus, "section (B)(iii)" and "subsection (B)(i)(I)."
**2** The City Council complied with this order sometime in October, 1997, following the district court's denial, on October 14, of a motion for stay pending appeal. The record does not reveal whether the towers have been built.

for reviewing local zoning decisions under the Due Process and Equal Protection Clauses. See Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 388 (1926); Village of Belle Terre v. Boraas, 416 U.S. 1, 5-8 (1974). Appellees AT&T and PrimeCo, on the other hand, argue that the City Council's approach would reduce subsection (B)(i)(I) to superfluity. They appear to suggest that we somehow borrow from other federal laws using the word "discriminate." Thus, they cite Town of Huntington v. Huntington Branch NAACP, 488 U.S. 15 (1988), a case under the Fair Housing Act, although the Court in Huntington explicitly did not reach the question of the proper test for determining discrimination under that law. Id . at 18. They also cite a case applying a regulation imposing the affirmative duty to "reasonably accommodate" certain interests, see Pentel v. Mendota Heights, 13 F.3d 1261, 1263-64 (8th Cir. 1994), although subsection (B)(i)(I) imposes only a negative duty. They do not explain how either the disparate impact test they suggest with their cite to Huntington or the approach used in Pentel might carry over to the Telecommunications Act.

We need not resolve this dispute, however. First, we seriously doubt that the City Council discriminated at all  "among providers of functionally equivalent services," much less"unreasonably." While AT&T and PrimeCo provide digital service, two providers of analog service, GTE Mobile Net and 360**o** Communications, joined their application. Thus we are asked to believe that the City Council "discriminated" by denying an application involving both forms of wireless service and all four companies that offer wireless service in the Virginia Beach market. See J.A. at 92 (suggesting that these four companies are the only ones in the Virginia Beach market). This is dubious at best.

Second, even assuming that the City Council discriminated, it did not do so "unreasonably," under any possible interpretation of that word as used in subsection (B)(i)(I). We begin by emphasizing the obvious point that the Act explicitly contemplates that some discrimination "among providers of functionally equivalent services" is allowed. Any discrimination need only be reasonable. See 979 F. Supp. at 425 ("The fact that a decision has the effect of favoring one competitor, in and of itself, is not actionable.").

7

There is no evidence that the City Council had any intent to favor one company or form of service over another. In addition, the evidence shows that opposition to the application rested on traditional bases of zoning regulation: preserving the character of the neighborhood and avoiding aesthetic blight. If such behavior is unreasonable, then nearly every denial of an application such as this will violate the Act, an obviously absurd result.[3]

In finding to the contrary, the district court both adopted a cramped view of "the record" and misinterpreted the remarks of the one councilman to speak concerning the application. First, the district court wrongly restricted its analysis of the basis for the City Council's decision to a single statement of Councilman Harrison at the March 25 hearing. This ignores ample testimony from citizens at both the Planning Commission and City Council hearings demonstrating concerns over both the aesthetics of the towers and their incompatibility with the residential character of Little Neck. At the Planning Commission hearing, Mr. William Perdue objected to the towers as "an encroachment of development of commercial property" into "a pure residential area" and as "an unsightly thing." He dismissed appellees' claims that the towers would be concealed by foliage, pointing out that a good portion of the year there would be no tree cover. J.A. at 67-68. See id. at 74 (Mr. Larnett, making the same point). He added that residents of Little Neck had "fought hard to preserve the beauty of our community and the nature around us." J.A. at 68. Several other area residents objected on similar grounds.

Similar sentiments emerged at the City Council's March 25, 1997 meeting. See J.A. at 104 (Mr. Alcaraz expressing concern over towers

_____

[3] We note that the Conference Report, cited by the district court and both sides to this case, supports this view. It condemns decisions that "unreasonably favor one competitor over another" but emphasizes the conferees' intent that the discrimination clause "will provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services." H.R. Conf. Rep. No. 104-458, 104th Cong., 2d. Sess. 208, reprinted in 1996 U.S. Code Cong. & Admin. News 124, 222, 1996 WL 46795, *469.

8

"in a residential environment" and Mr. Shank stating that "[t]he proper place for telecommunication towers is an industrial or commercial area" and referring to the towers as "unsightly"). A representative of a local community group covering 425 homes testified to his opposition on the grounds that the towers would be "visual pollution" and "unsightly," notwithstanding appellees' efforts to soften their impact. J.A. at 105 (Mr. Haven).

The above evidence is more than enough to demonstrate the real, and surely reasonable, concerns animating the democratically elected City Council's "discrimination." None of those who testified suggested any ill will toward appellees, nor did any of them demonstrate dislike for digital service as opposed to analog. On the contrary, they hoped that towers might be located in a nearby commercial zone. See J.A. at 69, 75.

Second, the comments of Councilman Harrison strengthen this conclusion. While the district court accurately noted that Mr. Harrison observed that residents of Little Neck seemed satisfied with current wireless service, the court overlooked that on every occasion in which he did so it was in the context of weighing the need for the towers against his constituents' legitimate concerns. See J.A. at 101 ("[W]hat I'm hearing is a large majority of people that say .. . I'd rather have [just analog service] than have a tower."); id. at 107 ("[W]e have to weigh the burdens placed on the community by the Applicant versus the benefit to be gained for the overall community. . . . [T]he burden[s] on the community, as evidenced by the speakers against this Application tonight are clear, yet the benefits . . . are not.").

Finally, we note that in most of the other cases in which district courts have found unreasonable discrimination under the Act, the facility at issue was proposed either for an area zoned for commercial use or for a location where other towers or similar structures already existed, in contrast to the Little Neck area, which is residential and has no commercial towers. See, e.g., Smart SMR of New York, Inc. v. Zoning Comm'n of the Town of Stratford, 995 F. Supp. 52, 64 (D. Conn. 1998) (existing towers); Sprint Spectrum L.P. v. Town of Farmington, 1997 WL 631104, *3 (D. Conn.) (site "already contains five larger and taller lattice-type radio towers with guy wires"); Western PCS II Corp. v. Extraterritorial Zoning Auth. of the City and

9

County of Santa Fe, 957 F. Supp. 1230, 1237 (D. N.M. 1997) (tower to be next to water tank and not to exceed its height); BellSouth Mobility Inc. v. Gwinnett County, 944 F. Supp. 923, 924 (N.D. Ga. 1996) (area zoned commercial).

IV.

The district court, relying chiefly on the Conference Report to the Act,**4** held that subsection (B)(i)(II), which mandates that a State's regulation of wireless services "shall not prohibit or have the effect of prohibiting the provision of personal wireless services," only applies to "blanket prohibitions" and "general bans or policies," not to individual zoning decisions. 979 F. Supp. at 426, 427. Although appellees justifiably chide the district court for adopting the "legislative history first" method of statutory interpretation, we reach the same conclusion even without relying on the legislative history. Since appellees do not contend that the City Council has adopted any blanket ban, we affirm the district court's holding on this point.

First, any reading of subsection (B)(i)(II) that allows the subsection to apply to individual decisions would effectively nullify local authority by mandating approval of all (or nearly all) applications, a result contrary to the explicit language of section (B)(iii), which manifestly contemplates the ability of local authorities to "deny a request." Second, the numerous cases involving local zoning authorities' moratoria on new zoning permits demonstrate that the reading of the statute we adopt today would hardly render the section of no use. See Lucas v. Planning Board of the Town of LaGrange, 1998 WL 261566 (S.D.N.Y.); Sprint Spectrum L.P. v. Jefferson County, 968 F. Supp. 1457 (N.D. Ala. 1997); Sprint Spectrum L.P. v. Town of West Seneca, 659 N.Y.S.2d 687 (Sup. Ct. 1997); Town of Farmington, 1997 WL 631104; Sprint Spectrum L.P. v. City of Medina, 924 F. Supp. 1036

_____

**4** "Actions taken by State or local governments shall not prohibit or have the effect of prohibiting the placement, construction or modification of personal wireless services. It is the intent of this section that bans or policies that have the effect of banning personal wireless services or facilities not be allowed and that decisions be made on a case-by-case basis." H.R. Conf. Rep. No. 104-458 at 208, reprinted in 1996 U.S. Code Cong. & Admin. News at 222.

10

(W.D. Wash. 1996). Third, our reading simultaneously furthers the Act's explicit goals of facilitating competition, by strengthening the hand of new market entrants who cannot show that they have been unreasonably discriminated against, and of preserving a large portion of local authority by maintaining that authority in particular cases. Finally, we note that on this question district courts in Connecticut and Florida have since followed the lead of the district court in this case. See Cellco Partnership v. Town Plan and Zoning Comm'n of the Town of Farmington, 1998 WL 220030, *5 (D. Conn.); Smart SMR, 995 F. Supp. at 57; AT&T Wireless Services of Fla., Inc. v. Orange County, 982 F. Supp. 856, 860 (M.D. Fla. 1997). See also Virginia Metronet, Inc. v. Board of Supervisors of James City County, 984 F. Supp. 966, 971 (E.D. Va. 1998) (reaffirming and explaining treatment of subsection (B)(i)(II) by district court in this case).

Appellees argue that this reading makes nonsense of the statute by requiring two different meanings of the single word "regulation" in section (B)(i) -- the first, in subsection (I), providing that case-by-case regulation shall not "unreasonably discriminate" and the second, in subsection (II), providing that no general ban or policy may "prohibit or have the effect of prohibiting" wireless service. We find this argument unconvincing. First, even if we adopted appellees' characterization of the section as we interpret it, the word "regulation" encompasses both general policies and case-by-case decisionmaking. There is nothing absurd in a statute having separate provisions for each of these meanings. Second, there is no need so to confine subsection (B)(i)(I), since discrimination could be pursuant to a general policy just as much as it could result from case-by-case decisionmaking. The converse is not true for subsection (B)(i)(II) -- under our reading, a case-based rejection of an application could not violate it -- but this is necessary to avoid destroying local authority and to reconcile subsection (B)(i)(II) with section (B)(iii), as discussed above. In addition, we see no reason why policies that do not explicitly ban new service but do, when applied on a case-by-case basis, guarantee the rejection of every application could not also violate subsection (II). See Virginia Metronet, 984 F. Supp. at 971.

V.

Appellees also contend, and the district court held, that the City Council did not issue a "decision . . . in writing and supported by sub-

stantial evidence contained in a written record," as section 704(c)(7)(B)(iii) requires. We disagree.

We treat separately the two requirements of section (B)(iii). We can quickly dispose of the first: the City Council's decision clearly was "in writing," and the district court could only find to the contrary by importing additional language into the statute. The City Council's decision was reflected "in writing" both in the condensed minutes of the March 25 meeting and in the letter from the Planning Commission describing the application, with the word "DENIED" and the date of decision affixed.

The district court blurred the Act's separate requirements of a written decision and of substantial evidence, concluded that "substantial evidence" drew on standards of federal administrative law, then imported those standards not only into its evaluation of "substantial evidence" but also into the Act's requirement of a "decision . . . in writing." Having done so, it held that a "decision . . . in writing" must include findings of fact and an explanation of the decision.

This was error. Besides supplementing the statutory text, this holding misunderstands comparable provisions of administrative law and ignores other sections of the Act. The Administrative Procedure Act ("APA") requires review for "substantial evidence" in cases of adjudications and formal rulemaking by federal agencies. See 5 U.S.C. § 706(2)(E); Ethyl Corp. v. EPA , 541 F.2d 1, 37 n.79 (D.C. Cir. 1976). While courts applying this standard demand both findings and an explanation of the decision, see, e.g., Arnold v. Secretary of Health, Education, and Welfare, 567 F.2d 258, 259 (4th Cir. 1977), this is because the statute explicitly so requires. Under the APA, "[a]ll decisions" in adjudications or formal rulemaking"shall include a statement of . . . findings and conclusions, and the reasons or basis therefor. . . ." 5 U.S.C. § 557(c). Rules promulgated under informal rulemaking procedures similarly must include "a concise general statement of their basis and purpose." Id. at § 553(c). Portions of the Telecommunications Act other than section 704 contain similarly explicit language. See 47 U.S.C. § 252(e)(1) (requiring "written findings as to any deficiencies" of certain agreements); id. at § 271(d)(3) (requiring FCC to "state the basis for its approval or denial" of certain applications). Thus it is clear that Congress knows how to demand

12

findings and explanations and that it refrained from doing so in section (B)(iii). See Keene Co. v. United States, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . ., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The simple requirement of a"decision . . . in writing" cannot reasonably be inflated into a requirement of a "statement of . . . findings and conclusions, and the reasons or basis therefor."

The district court also derived its requirement of findings and an explanation from their alleged necessity for judicial review. To the extent that this rationale is separable from the court's reliance on federal administrative law, we reject it also. The separate substantial evidence requirement, discussed below, ensures more than sufficient information to enable judicial review of compliance with other parts of section 704(c)(7)(B). See Gearon & Co., Inc. v. Fulton County, 1998 WL 292095, *2 (N.D. Ga.) (finding written notice of fact and date of denial of application to satisfy writing requirement, and proceeding to evaluate decision under substantial evidence requirement); BellSouth, 944 F. Supp. at 926, 928 (implicitly doing same).

Turning to the second requirement of section (B)(iii), we hold that the City Council's decision was "supported by substantial evidence contained in a written record." The Supreme Court has explained that "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera v. NLRB, 340 U.S. 474, 488 (1951) (internal quotations omitted). While "substantial evidence" is more than a scintilla, it is also less than a preponderance. NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir. 1997). A court is not free to substitute its judgment for the agency's (or in this case the legislature's); it must uphold a decision that has "substantial support in the record as a whole" even if it might have decided differently as an original matter. Id. at 1044 (internal quotations omitted).

The Virginia Beach City Council is a state legislative body, not a federal administrative agency. The "reasonable mind" of a legislator is not necessarily the same as the "reasonable mind" of a bureaucrat, and one should keep the distinction in mind when attempting to

13

impose the "substantial evidence" standard onto the world of legislative decisions. It is not only proper but even expected that a legislature and its members will consider the views of their constituents to be particularly compelling forms of evidence, in zoning as in all other legislative matters. These views, if widely shared, will often trump those of bureaucrats or experts in the minds of reasonable legislators.

In light of these principles, the City Council's decision clearly does not violate the "substantial evidence" requirement. The record here consists of appellees' application, the Planning Department's report, transcripts of hearings before the Planning Commission and the City Council,[5] numerous petitions opposing the application, a petition supporting the application, and letters to members of the Council both for and against. Appellees correctly point out that both the Planning Department and the Planning Commission recommended approval. In addition, appellees of course had numerous experts touting both the necessity and the minimal impact of towers at the Church. Such evidence surely would have justified a reasonable legislator in voting to approve the application, and may even amount to a preponderance of the evidence in favor of the application, but the repeated and widespread opposition of a majority of the citizens of Virginia Beach who voiced their views -- at the Planning Commission hearing, through petitions, through letters, and at the City Council meeting -- amounts to far more than a "mere scintilla" of evidence to persuade a reasonable mind to oppose the application.[6] Indeed, we should wonder at a

_____

[5] We see no irregularity in the City Council issuing a verbatim transcript of its hearing after it made its decision and incorporating that transcript into the record. This is standard legislative practice, and the Act, unlike the APA, does not require a decision "on the record," 5 U.S.C. § 553(c). It is absurd to suggest that a hearing that the legislators themselves attended and participated in cannot be part of the record simply because they did not either produce a real-time transcript or postpone their vote until after the transcript was prepared.

[6] A few citizens did mention health concerns from radio emissions, a concern the Act precludes, 47 U.S.C. § 332(c)(7)(B)(iv), but these were a small fraction of the overall opposition, which focused on the appearance of the 135-foot towers and on the inappropriateness of commercial towers in a residential area. Cf. H.R. Conf. Rep. 104-458 at 208, reprinted in 1996 U.S. Code Cong. & Admin. News at 222 ("[T]he conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit for a competitor's 50-foot tower in a residential district.").

14

legislator who ignored such opposition. In all cases of this sort, those seeking to build will come armed with exhibits, experts, and evaluations. Appellees, by urging us to hold that such a predictable barrage mandates that local governments approve applications, effectively demand that we interpret the Act so as always to thwart average, non-expert citizens; that is, to thwart democracy. The district court dismissed citizen opposition as "generalized concerns." 979 F. Supp. at 430. Congress, in refusing to abolish local authority over zoning of personal wireless services, categorically rejected this scornful approach.

CONCLUSION

Accordingly, we reverse the district court and order summary judgment in favor of the City Council on the claims involving subsection (B)(i)(I) and section (B)(iii), and affirm the district court's grant of summary judgment in favor of the City Council on the claim involving subsection (B)(i)(II).**7**

IT IS SO ORDERED.

_____

**7** Because our statutory analysis resolves all issues in this case, we do not reach the City Council's arguments that section 704(c)(7) of the Act, at least as interpreted by the district court and appellees, is unconstitutional under cases such as Printz v. United States, 117 S. Ct. 2365 (1997), and New York v. United States , 505 U.S. 144 (1992). See Harmon v. Brucker, 355 U.S. 579, 581 (1958) (noting courts' "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case").

15