PETERSBURG CELLULAR
PARTNERSHIP,
Plaintiff,

v.

BOARD OF SUPERVISORS OF
NOTTOWAY COUNTY,
Defendant.

No. Civ.A. 3:98cv503.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 14, 1998.

---

Patricia D. McGraw, Tremblay & Smith, Charlottesville, VA, M.E. Gibson, Jr., Tremblay & Smith, Charlottesville, VA, for Plaintiff.

John Lyons Marshall, Jr., Patrick Michael McSweeney, McSweeney, Burtch & Crump, Richmond, VA, for Defendant.

### FINAL ORDER OF DECLARATORY JUDGMENT AND WRIT OF MANDAMUS

RICHARD L. WILLIAMS, Senior District Judge.

### MEMORANDUM OPINION

This is an action for declaratory and injunctive relief filed under the Telecommunications Act, 47 U.S.C. § 332(c). The matter is before the Court on the parties' cross motions for summary judgment. Summary judgment may be granted if, after consideration of such items as depositions, affidavits or certifications, and after viewing the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties concede, and the Court agrees, that no material facts are in dispute and that summary judgment is appropriate. For the reasons stated below, the Court DENIES defendant's motion for summary judgment and GRANTS plaintiff's motion for summary judgment.

### FACTS

The basic facts giving rise to this case are not disputed. Defendant Board of Supervisors of Nottoway Count (the "Board") denied a conditional use permit sought by plaintiff Petersburg Cellular Partnership ("360 Communications"). The Board required the special use permit (the "Permit") to erect a 199' wireless personal communications services tower. The tower's intended location was along Route 460 near the intersection of Route 669 on private land in Nottoway County. The tower was primarily intended to service wireless communications along Route

460. A small private airstrip is two miles away. The nearest property line is 75' from the intended site and the nearest residence is 300' from the intended site.

360 Communications submitted an application for the Permit on March 20, 1998. On April 14, 1998, Nottoway County's Planning Commission unanimously approved the Permit subject to three conditions 360 Communications intended to satisfy. Those conditions were: first, approval by the Federal Aviation Administration ("FAA"); second, the absence of interference with television reception; and third, rent-free co-location of county-operated emergency broadcast systems.

On April 16, 1998, the Board held a meeting and solicited input on the Permit. Three residents of the county attended and expressed their dissatisfaction. The comments generally concerned aviation safety, safety of children residing nearby, and safety in the event of a tower collapse. Representatives of 360 Communications were present and addressed these concerns. The Board voted to table the Permit pending FAA evaluation.

On July 4, 1998. the FAA approved 360 Communications' Permit. On July 9, 1998, 360 Communications informed the Board of the FAA approval. On July 16, 1998, the Board again took up the issue. Neither opponents of the Permit nor representatives of 360 Communications addressed the Board at this meeting. One county resident registered opposition to the Permit telephonically without stating the specific grounds for her opposition. The Board voted unanimously to reject the Permit. On July 21, 1998, Nottoway County's Zoning Administrator provided the owner of the land on which the tower was to be erected, Harley L. Dalton, a letter informing him of the vote to reject the Permit. Mr. Dalton provided the letter to 360 Communications. In addition to the letter, the Board provided 360 Communications a written transcript of its July 16, 1998 proceedings on August 20, 1998.

### LEGAL ANALYSIS

■ The Telecommunications Act "is intended to create a national policy framework to accelerate the deployment of telecommunications technology...." *Virginia Metronet, Inc. v. The Board of Supervisors of James City County,* 984 F.Supp. 966 (E.D.Va.1998).

The Act accomplishes the goal by "placing certain substantive and procedural limitations upon the authority of local bodies to regulate and limit the construction of facilities for wireless communication services." *Id.*

More specifically, the Telecommunications Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). 360 Communications contends that the Board violated the Telecommunications Act because it did not issue a written decision documenting the Board's denial of the Permit and because the denial is not supported by substantial evidence. The Board contends that its July 21, 1998 letter to Mr. Dalton and the transcribed minutes of the its meeting satisfy the "in writing" requirement of the Telecommunications Act. It further contends that record contains "substantial evidence" to support the Board's decision.

### A. The "In Writing" Requirement

■ The express terms of the Telecommunications Act require that any denial of a special use permit for personal wireless communications service facilities be "in writing." 47 U.S.C. § 332(c)(7)(B)(iii). The United States Court of Appeals for the Fourth Circuit elaborated on this requirement in *AT&T Wireless PCS, Inc. v. City Council of the City of Virginia Beach,* 155 F.3d 423 (4th Cir.1998). The Court held that a city council satisfied the "in writing" requirement by producing condensed minutes of the meeting during which the special use permit was denied. It is clear, therefore, that the transcript of such a meeting generally satisfies the Telecommunications Act's "in writing" requirement.

However, 360 Communications argues that the transcript in the instant case differs from that at issue in *AT&T Wireless.* The Telecommunications Act provides a wireless service provider thirty (30) days in which to appeal the adverse decision of a local zoning authority. *See* 47 U.S.C. § 332(c)(7)(B)(v). In the instant case, that thirty (30) day peri-

od ended before the Board provided the transcript. Because the transcript was provided only after the appeal period expired, 360 Communications argues that the transcript does not satisfy the edicts of the Telecommunications Act. *See Western PCS II Cop. v. Extraterritorial Zoning Authority of City and County of Santa Fe,* 957 F.Supp. 1230 (D.N.M.1997). Were the transcript the only written record of the Board's decision, this argument would merit greater consideration.

However, in addition to the transcript, the county Zoning Administrator provided Mr. Dalton, the owner of the land on which the tower was to be erected, a letter documenting the denial of 360 Communications' Permit. Mr. Dalton forwarded the letter to 360 Communications. 360 Communications contends that the letter written did not satisfy the Telecommunications Act because it was not authored by a member of the governing body responsible for the decision.

The Court acknowledges a divergence of authority regarding this argument. *Compare Illinois RSA No. 3, Inc. v. County of Peoria,* 963 F.Supp. 732 (C.D.Ill.1997) (holding that the written record of denial must be authored by a member of the governing body rendering the decision); *Virginia Metronet, Inc. v. The Board of Supervisors of James City County,* 984 F.Supp. 966 (E.D.Va.1998) (same); *with Sprint Spectrum L.P. v. Town of North Stonington,* 12 F.Supp.2d 247 (D.Conn.1998) (holding that letter from governing body is preferred, but not essential, to satisfy the "in writing" requirement).

█ The Fourth Circuit has not explicitly ruled on this exact issue. However, it has implicitly sanctioned correspondence not authored by the responsible governing body. *See AT & T Wireless,* 155 F.3d at 429–30 (holding that a letter authored by the city's Planning Commission and sent to the City Council that was directly challenged on other grounds nonetheless satisfied the "in writing" requirement). The intent of the "in writing" requirement is to facilitate prompt appeals. The fact that 360 Communications promptly obtained the letter from the Zoning Administrator and timely filed this appeal indicates that the document fulfilled the intent of the statute at issue. Accordingly (and without determining the legal sufficiency of the transcript provided post-appeal),

the Court holds that the letter from the Zoning Administrator to Mr. Dalton satisfies the "in writing" requirement of the Telecommunications Act.

### B. The "Substantial Evidence" Requirement

In addition to being "in writing," the Telecommunications Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be … supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). The standard for "substantial evidence" is the "traditional standard used for judicial review of agency actions." H.R.Conf.Rep. No. 104–458, at 445–48 (1996), *reprinted in* 1996 U.S.C.C.A.N. 142, 222.

In the specific context of the Telecommunications Act, the Fourth Circuit defines "substantial evidence" to be "more than a scintilla, … [and] less than a preponderance" of evidence, *AT & T Wireless,* 155 F.3d at 430 (citing *NLRB v. Grand Canyon Mining Co.,* 116 F.3d 1039, 1044 (4th Cir.1997)), and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Universal Camera v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

360 Communications argues that the Board did not base its denial of the Permit on substantial evidence. Conversely, the Board argues that the record satisfies this standard. The parties agree on the following relevant facts. Three Nottoway County residents spoke against the Permit at the April 16, 1998 meeting. The residents' concerns generally focused on perceived safety hazards engendered by the proximity of a nearby airstrip, Route 460, and a residence in which children lived. No county resident spoke in favor of the Permit. Several representatives of 360 Communications attended the meeting and addressed the residents' concerns at length.

The Board voted four to one to table the Permit pending FAA evaluation of the Permit. On July 4, 1998, the FAA approved the Permit, determining that the "proposed con-

struction would not be a hazard to air navigation." 360 Communications informed the Board of the FAA's approval in a letter dated July 9, 1998. On July 16, 1998, the Board again deliberated the Permit. There is no evidence in the record to suggest that any resident attended the meeting to register an opinion regarding the tower. Nor is there evidence in the Record to suggest that representatives of 360 Communications attended the meeting. One County resident apparently previously telephoned a Board member to register her opposition to the Permit on unstated grounds.

Having outlined the basic facts relevant to the Board's denial of the Permit, the Court next examines the evidence before the Board in greater detail to determine whether the Board might have possibly based its denial of the Permit on "substantial evidence."

### A. Aviation Safety

The opposition to the Permit expressed at the April 16, 1998 meeting primarily concerned aviation safety. One resident stated "It's in the runway where they're wanting to put the tower." *See* Joint Appendix at 19. Another stated "I don't want that—they hit the tower whether it has a light on it or not." *See* Joint Appendix at 21. She continued "I'm just opposed to it ... Even if the FAA does approve it with or without the lights, it's still a danger because you've got pilots—I'm not saying all pilots—but there are some pilots that will get cocky and want to show off and try to do stunts." *Id.* The same resident later added that "if they put a light on it how do you know that one of the pilots—not all of them but some of them have been known to be tired—[won't] mistake that light for the landing—if they are a new pilot to the area and try to land the plane going down there. Instead of knowing it's a tower." Joint Appendix at 24. One Board member noted that "those helicopters do move low and they do move quite swiftly." Joint Appendix at 24.

In an attempt to allay these concerns, the representatives from 360 Communications addressed the Board. They assured the Board and members of the public in attendance that the tower would not be constructed absent FAA approval. Joint Appendix at 18, 25. They informed the Board that 360 Communications had retained an aviation consulting firm to assist with the FAA application. Joint Appendix at 18, 25–26. They detailed the site selection criteria in response to suggestions that other locations would be more compatible with local flight patterns. Joint Appendix at 17, 19, 28. They further assured the Board that 360 Communications would accede to additional lighting requirements imposed by the Board, even if not required by the FAA. Joint Appendix at 26.

### B. Safety of Adjacent Residents

The other substantial concern of opponents of the tower was the safety of adjacent residents. One opponent stated "[i]f lightning or something was to strike it, how do we know part of it wouldn't hit [Route] 460? Some would this ladies' house right back here—she has small children." Joint Appendix at 19. Another opponent stated that in the event of an aviation "wreck—it explodes—it's going to land on my house and my neighbor's house ... my kids, they, we run through the woods, they are at the age now they're wanting to build forts, they's getting curious, it's too close. Especially with tall boys." Joint Appendix at 21. She continued: "[b]oys are going to be boys and when they get away from Mama and Daddy they are going to explore and do what they want to do. Sooner or later they'll try to climb the tower." Joint Appendix at 24.

Representatives from 360 Communications responded to these concerns. They noted that the tower would be surrounded by an eight-foot-tall security fence topped with barbed wire, Joint Appendix at 18, 25, and that, with the exception of a power line that might be necessary to power an aviation warning light, the tower was not electrified. Joint Appendix at 25. They ensured the Board that the tower had been designed to withstand the highest wind on record in the area, even if loaded by one-half inch of ice. Joint Appendix at 29. They further noted that the tower included two breaking points that would cause it to collapse upon itself in the unlikely event of a fall. Joint Appendix at 29. The Board apparently did not avail itself of 360 Communications' offer to review an engineering analysis attesting to this design. *Id.* The representatives noted that both Route 460 and the nearest residence

were significantly farther from the base of the tower than the tower was tall, and that even if the design were to fail, it was therefore impossible for the tower to fall on an adjoining residence or Route 460. Joint Appendix at 28, 19, and 21. Finally, 360 Communications noted the permission it granted county emergency services to co-locate communications facilities at the tower rent-free. Joint Appendix at 16.

### C. The Stated Grounds for Denial of the Permit

The Board again considered the Permit on July 16, 1998. During this meeting, the Board received no public input regarding the tower. Board members reported general opposition on unstated grounds. "The people in the neighborhood did not want the ... structure there ...[,]" Joint Appendix at 45, "they do object to it ... I can't support putting it on a place where it is not reasoned or desire[d]." Joint Appendix at 46. "I've talked to my people in that area and they ... Don't want it...." *Id.* Another Board member stated that the opposing residents "were there first. And we have to say—are we going to allow our citizens to [take] this crap?" *Id.*

Following a brief discussion, the Board unanimously voted to reject the Permit. It is important to note that not a single member of the Board explicitly premised their opposition to the Permit on the potential safety hazards to aviators or adjacent landowners. The record aptly illustrates that these perceived hazards were the result of unfounded conjecture and baseless speculation. The record provides irrefutable evidence that each of these concerns, though undoubtedly genuine, was dispelled by 360 Communications' representatives and the FAA. *See AT&T Wireless PCS Inc. v. The City of Chamblee,* 10 F.Supp.2d 1326 (N.D.Ga.1997) (discounting laypersons' concerns regarding aviation safety in light of FAA approval). 360 Communications countered the conjecture of the three opponents who spoke against the Permit by supplying the FAA approval and proffering an engineering analysis. The specific, probative, and uncontroverted evidence offered by 360 Communications demonstrates that the opposition to the tower, though undoubtedly sincere, was not based in fact and can not legally support a reasonable judgment denying the Permit.

Having dispelled the unsubstantiated safety concerns, what remains is simply general antagonism to the Permit expressed by four residents of the area. As the Fourth Circuit noted, "such views, *if widely shared,* will often trump those of bureaucrats or experts in the minds of reasonable legislators." *AT & T Wireless,* 155 F.3d at 430 (emphasis added). It is important to note that the hostility to the permit at issue in that case was established by petitions with hundreds of signatures, which is significantly more substantial than the four county residents cited by the Board as having expressed their opposition to the Permit. Were courts to sanction the denial of such permits based upon this substantively vague and numerically insubstantial opposition, the Telecommunications Act would be effectively nullified.

This Opinion and the accompanying Order should not be construed as denigrating either the the residents' democratic participation in this process or the Board's laudatory sensitivity to their constituents' concerns. Both are to be commended. However, when those views are expressed by such a modest number and founded upon such a speculative record, they are insufficient as a matter of law. *See PrimeCo Personal Communications v. Village of Fox Lake,* 26 F.Supp.2d 1052 (N.D.Ill.1998).

360 Communications seeks a declaration that the Board has violated the Telecommunications Act as well as a writ of mandamus directing the Board to issue the Permit to 360 Communications. This form of relief is authorized under the Telecommunications Act, and appropriate in this case. *See Western PCS II Corp. v. Extraterritorial Zoning Authority of the City and County of Santa Fe,* 957 F.Supp. 1230, 1239–1240 (D.N.M. 1997); *BellSouth Mobility, Inc. v. Gwinnett County, Georgia,* 944 F.Supp. 923, 929 (N.D.Ga.1996). Plaintiff has demonstrated its compliance with all valid requirements necessary to receive a construction permit. The Court finds that a remand "would frustrate the Telecommunications Act's direction to expedite these proceedings." *Illinois RSA No. III,* 963 F.Supp. at 746. Accord-

ingly, the Court will grant the relief requested by plaintiff and order defendant to issue a building permit for plaintiff' s proposed tower.

Because the law in this area is rapidly evolving and because the Board's denial of the Permit was done in good faith, 360 Communications' motion for attorney's fees will be denied.

An appropriate Order shall issue.

## FINAL ORDER OF DECLARATORY JUDGEMENT AND WRIT OF MANDAMUS

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons set forth in the accompanying Memorandum Opinion, the Court GRANTS plaintiff's motion for summary judgment and denies defendant's motion for summary judgment. The Court hereby DECLARES the defendant in violation of the Telecommunications Act, Title 47 U.S.C. § 332(c). It is therefore ORDERED that defendant Board of Supervisors of Nottoway County approve plaintiff's March 20, 1998 application for a conditional use permit reproduced on page 1 of the Joint Appendix to this case. Defendant will approve plaintiff's application for a conditional use permit at its next regularly scheduled meeting. However, in no event shall approval be granted later than thirty (30) days after entry of this writ. Plaintiff shall construct the wireless personal communications services facility at issue to accord with the conditions imposed by the Nottoway County Planning Commission on April 14, 1998 and the Federal Aviation Administration on July 4, 1998. Because of the evolving nature of the law in this area and because defendant's denial of the conditional use permit was not in bad faith, the Court hereby DENIES plaintiff's motion for attorney's fees.

It is so ORDERED.