NEXTEL COMMUNICATIONS OF THE MID–ATLANTIC, INC., d/b/a Nextel Communications, Plaintiff

v.

CITY OF CAMBRIDGE; Planning Board of the City of Cambridge; and Thomas Anninger, Florrie Darwin, Pam Winters, and Hugh Russell in their capacities as members of the Planning Board of the City of Cambridge, Defendants

No. CIV.A. 02–10429GAO.

United States District Court, D. Massachusetts.

Feb. 28, 2003.

Steven E. Grill, Esq., Devine, Millimet & Branch, Manchester, NH, for Nextel Communications of the Mid–Atlantic, Inc., d/b/a Nextel Communications, Plaintiff.

Nancy B. Schlacter, Cambridge City Law Department, Cambridge, MA, for City of Cambridge, the Planning Board of the City of Cambridge, Thomas Anninger, Florrie Darwin, Pam Winters, Hugh Russell, Defendants.

## MEMORANDUM AND ORDER

O'TOOLE, District Judge.

Invoking provisions of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c)(7)(B), Nextel Communications ("Nextel") filed this suit because the defendants denied Nextel's application for a special permit allowing it to place wireless telecommunications equipment on the outside of the Royal Sonesta Hotel in Cambridge, Massachusetts. Nextel alleges that the decision to deny Nextel's application was not supported by substantial evidence contained in a written record and it unreasonably discriminated against Nextel because the defendants had allowed other wireless service providers to place equipment on a sign located on the roof of the same hotel. Both parties have now moved for summary judgment. They agree that the record before the Court adequately establishes the facts in this case and that the issues presented can be decided by the Court as a matter of law. The major area of contention between the parties is to what extent the defendant Planning Board ("Board") was justified in rejecting Nextel's proposal based on aesthetic concerns.

### A. Summary of Facts

Nextel is licensed by the Federal Communications Commission to provide wireless telecommunications services in various parts of Massachusetts, including the City of Cambridge. To provide such services, Nextel installs antenna facilities throughout its coverage area. The antennas are connected to receivers and transmitters that operate within a limited geographic area known as a "cell." In 2001 Nextel determined that its wireless service in the eastern portion of Cambridge was unreliable because there were not enough antennas in that cell. If there are not enough antennas in a given area, Nextel's customers may not be able to place calls in that area, or their calls may be disconnected. Although Nextel has some antennas in the eastern portion of Cambridge, it found that the number was insufficient for consistent service.

To address these problems, Nextel began searching for existing structures on which it could mount additional antennas. After locating several buildings which might serve as suitable sites, Nextel decided the best location for its antennas would be on several sides of the Royal Sonesta Hotel. Nextel would not have been the first wireless communications provider to place antennas on the Sonesta. One or more other wireless providers currently have antennas installed on the hotel sign on the roof of the Sonesta.

The area in which Nextel wanted to locate its additional antennas is in a portion of the City that has been designated as a "planned unit development district," identified as the PUD–2 District, under the Cambridge zoning by-law. Wireless telecommunications antennas and related equipment are a permitted use in such districts, subject to the grant of a special permit by the appropriate authority. In the case of the PUD–2, the relevant body was the district's Planning Board. The zoning regulations provide some general guidelines that the Board must follow in determining whether to grant such permit applications. See Kovacs Aff., Ex. A, Cambridge, Mass., Zoning Ordinance, art. 4.32(g) n. 49. The criteria include the "extent to which the visual impact of the various elements of the proposed facility is minimized" through "the use of existing mechanical elements on a building's roof or other features of the building as support and background," "the use of materials that in texture and color blend with the materials to which the facilities are attached," and "[o]ther effective means to

reduce the visual impact of the facility from off the site." *Id.*

On September 4, 2001, Nextel submitted an application for a special permit to the Board that proposed a facility consisting of three arrays, each containing four antennas, to be mounted on three sides of the Sonesta, and an equipment shelter which would be located on top of an existing portion of the hotel. The Board held an initial hearing on Nextel's application on November 20, 2001. At this first hearing, the Board reviewed a packet of material which contained photo simulations and design sketches of Nextel's proposed antennas and equipment shelter. After an initial presentation by Nextel, the Board's members voiced several concerns about the aesthetics of the project. They were particularly troubled by the visibility of the equipment shelter and by the fact that the antennas were in the middle of an otherwise flat, blank brick wall. There also was considerable concern that the antennas were closer to the ground than installations by other wireless providers, and that as a result the antennas would be too visible to passers-by. One of the members commented that this was "one of the most intrusive antenna installations I've seen come before us." *Kovacs Aff.*, Ex. C at 61.

After the hearing, in response to these comments, Nextel made several adjustments to its proposal. It lowered the height of the equipment shelter and moved it farther back from the roofline. Nextel also decided to use fiberglass panels painted to match the color of the building to conceal the antennas, and it removed the antennas that were on the side of the hotel directly facing the street.

A hearing on the revised Nextel proposal was held on January 8, 2002. Although at one point one of the Board members commented that Nextel had done a "great job" at addressing some of the concerns raised at the previous hearing, *Kovacs Aff.*, Ex. F at 128; in the end the Board as a whole was still dissatisfied. The Board felt that the painted fiberglass panel did not remedy the problem that Nextel's project would place visually unattractive protrusions on the face of the hotel's flat brick wall. Although some members were pleased with the changes in the equipment shelter's design, others were concerned that it was still too visible. As the debate about the Nextel project went on, a new thread of concern also appeared in the dialogue. This began when one board member commented:

I am starting to have a concern about the proliferation of [these antenna projects], and it seems like that we see these all the time. We get—you know, and they are sort of—well, that's not so bad, and that one is not so bad, and—but it just—it's creeping. You know, they are on every building and, in this case—in most cases, they are way up out of sight. They are at least over your—you don't see them unless you are looking up and looking for them, but now they are creeping down and getting closer to your normal eye level, and you know, you look at the north elevation of this building, there are two of them on the Royal Sonesta sign already. They aren't even aligned.

I mean, they are just—this stuff is just creeping and I am wondering if maybe this isn't the time to address it, but I think we do have to sort of address what it is going to take for us to start saying no because there seems to be no be no end to it. I can't see where the end is going to be to it. And it may seem unfair to sort of single out one particular vendor to start making a statement about, but I think, at a certain point, enough is going to be enough.

*Id.* at 128–29. Although some Board members agreed with this sentiment and said that they wanted to create a more coherent, perhaps more stringent approach to reviewing permit applications, no consensus on the matter was reached during the hearing. However, the Board members did agree that Nextel's revised proposal was not acceptable. They found that the antennas were too visible because they were too low to the ground and stuck out too far from the building. Some Board members suggested that Nextel should try to develop another proposal after consulting with the Sonesta's architect, but Nextel rejected the suggestion, electing to stand on the proposal as presented. Nextel's representative said to the Board, "The antennas are what they are. They basically have to go in these locations." *Id.* at 154. The Board then called for a vote on the proposal, and the special permit was denied.

On February 13, 2002, the Board formalized its denial of the permit by filing a written notice of decision with the Office of the City Clerk. The five-page written notice detailed the Board's views of the aesthetic shortcomings of Nextel's proposal. It stated, "Mounting the antennas on the flat face of the hotel facade, even with the 'stealth box,' fails to diminish the impact of the installation. The bold projections of either design on an otherwise unadorned wall, which is an important characteristic of the design of the hotel, remains objectionable to the Board particularly at this low elevation close to passers-by." *Kovacs Aff.*, Ex. G at 3. The Board reiterated that the equipment shelter was "a prominent and unattractive addition to the roofline of the one story pool shelter roof." *Id.* The written decision also noted that "the Board suggested that the applicant contact the original architect for the hotel, but the applicant did not indicate an interest in doing so." *Id.* at

3–4. Aggrieved by the denial of the special permit, Nextel commenced this action, claiming that the Board's decision violated important provisions of the TCA.

### B. *Discussion*

■ The TCA was enacted to expand the availability of wireless telecommunications services and to increase competition in the wireless telecommunications industry. *See Southwestern Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 57 (1st Cir.2001). The statute seeks to achieve this goal, in part, by regulating and facilitating the installation of mobile or wireless communication technologies throughout the United States. *See* 47 U.S.C. § 332. As part of this regulatory scheme, the TCA places some limits on the ability of local zoning authorities to exclude such technologies from the areas which they control. *See id.* § 332(c)(7)(B). The provisions that are relevant to this dispute state:

(i) The regulation of the placement, construction and modification of personal wireless service facilities by any State or local government or instrumentality thereof -

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

. . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

*Id.* These provisions of the TCA are "a deliberate compromise between two competing aims—to facilitate nationally the

growth of wireless telephone service and to maintain substantial local control over siting of [wireless equipment]." *Town of Amherst v. Omnipoint Communications Enters., Inc.,* 173 F.3d 9, 13 (1st Cir.1999).

1. *The Board's Decision Was Supported By Substantial Evidence Contained in a Written Record*

■ The standard for determining whether the Board's decision was supported by substantial evidence contained in a written record was summarized by the First Circuit in *Todd:*

"Substantial evidence" review under the TCA does not create a substantive federal limitation upon local land use regulatory power, but is instead centrally directed to those rulings that the Board is expected to make under state law and local ordinance in deciding on variances, special exceptions and the like. The "substantial evidence" standard of review is the same as that traditionally applicable to a review of an administrative agency's findings of fact.

*Todd,* 244 F.3d at 58 (citations and internal quotation marks omitted). Under that standard, substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.,* 164 F.3d 713, 718 (1st Cir.1999) (citations omitted).

■ The competing goals of providing optimal wireless service and preserving the aesthetic integrity of a cityscape often require balancing and trade-offs, and "subject to an outer limit, such choices are just what Congress has reserved to the [local authorities]." *Omnipoint Communications,* 173 F.3d at 15. A municipality may decide to reject a wireless project because of aesthetic concerns "without justifying that judgment by reference to an economic or other quantifiable impact." *Todd,* 244

F.3d at 61. The town's aesthetic judgment is valid as long as it is "grounded in the specifics of the case" and does not reflect generalized negative views that could apply to any wireless technology installation, "regardless of location." *Id.*

■ In this case, the Board's decision to deny the permit application is adequately supported by substantial evidence in the written record. The written decision set forth the Board's reasons for the denial in terms that were specific to the site and the details of Nextel's proposal. It is worth quoting the decision at length, because the Board's explanation of its decision demonstrates that the reasons for the decision were grounded in the specific design details as reflected in the record:

The visual impact of the various elements of the proposed facility has not been sufficiently minimized.

The original NEXTEL antenna and equipment cabinet proposal was very prominent on the façade of the hotel. It consisted of three antenna locations. The array of three antennas mounted on the entry façade of the hotel facing Cambridge parkway is well integrated into the design of that portion of the building and the Planning Board has no objection to that aspect of the proposal. The two arrays of three antennas each on the Land Boulevard façade of the original high-rise portion of the hotel are not well integrated; they appear to float on the surface at prominent locations low on the building and do not relate well to each other or any details of the building as they are viewed together from the west and southwest. In the original submission each antenna element was visible.

The original equipment cabinet shelter on the pool shelter was large and very prominent. It is a new element unrelated to any existing mechanical elements

or other features of the building in order to minimize its visual impact.

Although the amended proposal attempted to respond to the concerns expressed by the Planning Board, it failed to address and resolve them adequately. The amended antenna proposal for those arrays facing Land Boulevard were modified to be presented as a single mechanical box rather than three separate antennas. Mounting the antennas on the flat face of the hotel façade, even with the "stealth box," fails to diminish the impact of the installation. The bold projections of either design on an otherwise unadorned wall, which is an important characteristic of the design of the hotel, remains objectionable to the Board particularly at this low elevation close to passers-by. The hotel façade faces a heavily traveled arterial road and a public park where large numbers of pedestrians also travel.

The amended equipment shelter proposal presented at the subsequent Planning Board meeting was somewhat improved. It nevertheless remains a prominent and unattractive addition to the roofline of the one story pool shelter roof.

The Planning Board made suggestions as to alternative locations, in the approximate vicinity of the locations in the application, which in the Board's view would have mitigated the negative visual impact of the particular installation proposal. Each time the applicant asserted particular technical engineering reasons why the alternate suggestions could not be implemented (including below the overhang of the building where the units would be much less prominent).

It would appear that the applicant team is in need of architectural as well as technical engineering telecommunication advice to adequately address both the Board's visual concerns and the appli-

cant's own technical needs. In fact, the Board suggested that the applicant contact the original architect for the hotel, but the applicant did not indicate an interest in doing so. While the Board was willing to continue the case so that further exploration of options could be undertaken, the applicant chose to have the Board take final action.

· Therefore, the Board finds that the requirements of Section 4.40, Footnote 49 have not been met.

*Kovacs Aff.*, Ex. G, at 2–4.

The fact that Nextel does not agree with the Board's views does not make them erroneous. The difficulty is not that the Board's actions are insufficiently supported—the photo simulations in the record adequately demonstrate what Nextel's antennas would look like, according to Nextel. The problem rather is that the application and enforcement of aesthetic standards involves judgments that necessarily have a substantial subjective component. Beauty is in the eye of the beholder, and it is not uncommon for persons to form differing opinions about what is visually pleasing, especially in the mid-range, rather than at the extremes, of the spectrum of possibilities.

Nextel protests that the Board members' subjective opinions do not constitute "substantial evidence" upon which a decision may properly rest. That observation is quite right, but misses the point. The members' "subjective opinions" were the conclusions they drew after evaluating the evidence presented of the details of the proposal, including the graphic representations of what the installation would look like. The Board was called upon· by the zoning regulations to judge whether the appearance of the installation would satisfy the applicable criteria. The members' "opinion"—their *decision*—that it did not was grounded in the specifics of the pro-

posal, and that is all that the "substantial evidence" requirement demands. *Todd*, 244 F.3d at 61.

The defendants' decision might have been on shakier ground if Nextel had demonstrated that the Sonesta proposal genuinely was Nextel's only option, and that the proposal was necessary to close a "significant" coverage gap in East Cambridge. *See Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 631–35 (1st Cir.2002) (discussing when refusing to permit such a gap to be closed would violate the TCA). Nextel argues in its brief that for financial and technological reasons, the Sonesta was the only feasible location for its antennas, but the record does not support this argument. It is clear that the Sonesta was Nextel's preferred location for a combination of business and technical reasons. Nextel's explanation to the Board why particular alternate sites had been rejected does not clearly establish that there were no feasible alternatives, only that the best alternatives were less desirable that the Sonesta location. *See Kovacs Aff.*, Ex. E (January 7, 2002, letter). The Board could reasonably have concluded that other alternatives merited further exploration, and in fact, both the transcript of the second hearing and the written decision itself showed that the Board was open to further exploration of the issue, but Nextel declined the opportunity.

### 2. *The Board Did Not Unreasonably Discriminate*

 The Board's decision to deny Nextel's special permit application also was not unreasonable discrimination among providers of equivalent services. At least two Circuits have held that the TCA "explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed." *Sprint Spectrum*,

*L.P. v. Willoth*, 176 F.3d 630, 638 (2d Cir.1999) (citing *AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 427 (4th Cir.1998)). The Second Circuit found that a city may subject one provider's proposal to a more searching inquiry than that of a competing provider if the two proposals present different visual, aesthetic, or safety concerns. *Willoth*, 176 F.3d at 638–39. Similarly, the Fourth Circuit held that a city's determination that the plaintiff's tower proposal would be an "aesthetic blight" was not unreasonable discrimination against the plaintiff. *Virginia Beach*, 155 F.3d at 427.

Nextel tries to argue that the Board's actions were unreasonably discriminatory because the Board allowed one of its competitors, Cellular One, to place antennas on the Sonesta that are more of an eyesore than Nextel's proposed antennas. However, the Nextel proposal is not closely comparable to the Cellular One installation. Nextel's antennas would have been much closer to the ground than Cellular One's, and they would have jutted out of the blank wall rather than being attached to the hotel's rooftop sign, as Cellular One's antennas are. Both of these aesthetic differences were important to the Board, which felt that Nextel's antennas would be much more visible to street traffic than the existing ones. Since Nextel's proposed installation varies significantly from the existing ones, there is no basis for finding that the defendants unreasonably discriminated against Nextel.

### C. *Conclusion*

The Board's decision to reject Nextel's proposal did not violate the TCA. The decision was supported by substantial evidence contained in the written record, and it did not unreasonably discriminate against Nextel. Accordingly, the defendants' motion for summary judgment

(docket no. 25) is GRANTED, and Nextel's motion for summary judgment (docket no. 17) is DENIED.

Judgment shall enter in favor of the defendants dismissing the complaint on the merits.

It is SO ORDERED.