LAURENCE WOLF CAPITAL MAN-
AGEMENT TRUST, Plaintiff–
Appellant/Cross–Appellee,

v.

CITY OF FERNDALE, Defendant–
Appellee/Cross–Appellant.

Nos. 01–1142, 01–1457.

United States Court of Appeals,
Sixth Circuit.

April 10, 2003.

Before COLE, KRUPANSKY, Circuit Judges; and GWIN, District Judge.*

OPINION

GWIN, District Judge.

With this appeal, we examine four issues. First, we review whether the district court erred when it found that the City of Ferndale complied with a requirement of the Telecommunications Act of 1996 ("the Act") mandating that a local government's denial of a request to place a wireless service facility be in writing. Second, we decide whether the district court erred when it found that substantial evidence in the record supported the appellee's denial of appellant's request to place a wireless service facility on top of its building. Next, we examine whether the district court erroneously found that the appellee's zoning ordinance does not unreasonably discriminate among providers of functionally equivalent services. Finally, we review whether the district court erred in its finding that the appellee's zon-

ing ordinance does not prohibit or effectively prohibit the provision of wireless services.

With the appellee's cross-appeal, we examine whether the district court erred when it held that, under the Act, the appellee bears the burden of proof in matters of challenge and appeal.

This Court finds that the appellee did not comply with Act's requirement that a denial of a wireless service facility be in writing. We also find that the record does not contain substantial evidence supporting appellee's denial of the wireless service facility. We further find that the appellee's ordinance does not unreasonably discriminate among functionally equivalent service providers or effectively prohibit the provision of wireless services. Finally, we do not address the burden of proof issue because, irrespective of which party bears the burden of proof, the record does not contain the necessary substantial evidence supporting the Board's decision to rule in its favor.

I. Procedural Background

Plaintiff Laurence Wolf Capital Management Trust ("Wolf") brought this action against the City of Ferndale ("Ferndale") under 47 U.S.C. § 332, the Telecommunications Act of 1996 ("the Act"). The action stemmed from the Ferndale Board of Zoning Appeals' ("the Board") denial of AT&T Wireless Services, Inc.'s ("AT&T") variance application for placement of a wireless service facility on Wolf's building. Wolf alleged that Ferndale's Zoning Ordinance ("the Ordinance") violates 47 U.S.C. § 332(c)(7)(B)(i) because it effectively prohibits the provision of personal wireless services and unlawfully discriminates

---

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

among providers of functionally equivalent services. Wolf also asserted that the Board violated 47 U.S.C. § 332(c)(7)(B)(iii) by failing to support its denial of AT&T's variance application in writing and with substantial evidence.[1]

On November 29, 2000, the parties joined in a Joint Pretrial Statement that identified the factual and legal issues to be litigated and stipulated to certain facts. In that Joint Pretrial Statement, the parties stipulated that AT&T had applied for a use variance from the Board.

On December 8, 2000, the district court conducted a bench trial. The district court found in favor of Ferndale on all claims.

Regarding the effective prohibition of provision of wireless services claim, the district court held that "[w]here ... a zoning ordinance allows a wireless-communications provider the opportunity to construct its proposed facility at another site near to its proposed location, there is no refusal of market entry and thus no discrimination." The district court reasoned that AT&T had such an opportunity because its own representative said that AT&T could possibly put an antenna on at least one other site within a ½–mile of Wolf's building. For the same reasons, the district court also held that the Ordinance did not effectively prohibit the provision of wireless services.

Additionally, the district court held that the Board's May 10 meeting minutes met the Act's writing requirement. The district court further noted that even if the May 10 meeting minutes were not a writ-

ten denial, the January 27 letter satisfied the writing requirement because it "clearly states that AT&T's request was denied." The court also found that the Board met the substantial evidence requirement because "substantial evidence supports at least two of [Ferndale's five reasons articulated in the May 10 meeting minutes] for the denial." The district court found evidence supported the rationale that "no unique circumstances existed" because AT&T admitted during the December 21, 1999, Board hearing that one other alternative site existed. Also, the district court found that evidence supported the Board's rationale that the antenna would alter the neighborhood's character. In making this finding, the district court relied on computer-simulated before and after photos of the proposed antenna site, reasoning that the "proposed antenna would be the tallest structure in the vicinity."

Wolf subsequently filed a motion for reconsideration on December 29, 2000. The district court denied this motion on January 5, 2001.

Wolf filed a notice of appeal on January 17, 2001. Ferndale then filed its notice of cross-appeal.

## II. Factual Background

Wolf owns a building ("the Building") on the southeast corner of the Nine Mile and Woodward intersection in Ferndale, Michigan. This location is in a C-4 zoning district, a retail and office zoning district. The Building already houses an antenna for providing wireless communication. Air

---

1. This federal complaint followed Wolf's state action alleging the Board's actions were arbitrary, capricious, ultra vires and a tortious interference with a business relationship. Wolf filed the state complaint in the Circuit Court for the county of Oakland. On April 18, 2000, the state court held that Ferndale had not "supported its decision by evidence

on the record," as required by Michigan's Administrative Procedures Act, M.C.L. § 24.306. Accordingly, the state court remanded the matter to the Board and ordered the Board to provide a statement of the reasons for which it had denied AT&T's variance request.

Touch Cellular Services ("Air Touch") has a wireless antenna on the Building's roof.

AT&T is a wireless service provider. It has two existing wireless service facilities in Ferndale, a 100–feet monopole tower and a rooftop antenna.

Wolf and AT&T entered a lease agreement that gave AT&T the right to place a wireless-communication antenna on the Building's roof, contingent upon Ferndale's approval. Before entering the lease agreement, AT&T developed a search ring to find feasible cellular tower sites. The investigation yielded only one possible existing site, the Building. Beyond using an existing site, the study showed that the only other alternative was building a free standing tower in a district zoned for such use.

The Ordinance governs the placement and operation of wireless communication facilities. Three of the Ordinance's primary goals are to "encourage the location of towers in nonresidential areas, minimize the total number of towers throughout the community, and strongly encourage the joint use of new and existing tower sites as a primary option rather than construction of single-use towers." The Ordinance states that the number of independent towers should be minimized and the joint use of locations is favored.

Section 4.39 of the Ordinance provides that wireless communication facilities can be located on city owned or controlled property. Wireless communication facilities on private property require administrative approval. The Ordinance allows administrative approval of wireless communication facilities on private property in only M–1 and M–2 zoning districts. If the wireless communication facility is not located on city property or in an M–1 or M–2 zoning district, then the provider may place the facility in only either a C–1 or C–3 zoning district upon securing a special use permit approval from the Board. Further, under Section 22.05 of the Ordinance, a person may request a variance from the ordinance requirements where "there are practical difficulties or unnecessary hardship" in complying with the ordinance. Therefore, putting a wireless facility in a C–4 zoning district would require a variance approval under Section 22.05 of the Ordinance.

The Building is private property in the C–4 zoning district. Therefore, the Ordinance's plain language does not allow the placement of wireless antennas on the Building, and thus the Board has to approve a variance application before an antenna is placed on the building's roof. Despite this prohibition, the Building currently has an Air Touch wireless rooftop antenna. It is unclear whether Air Touch located the antenna before the enactment of the Ordinance or whether Ferndale granted Air Touch a variance. Ferndale claims that Air Touch sited the antenna before the Ordinance's enactment but the time of Air Touch's placement is not clear.

On October 26, 1999, AT&T filed a written application for a "use" variance at the Board's instruction. AT&T proposed placing a 20–feet monopole on the roof of Wolf's building. AT&T submitted a proposal that sited the 20–foot monopole behind billboards that were previously put on the roof. The monopole would extend 11–feet above the billboards. On November 16, 1999, the Board held a meeting to consider AT&T's application but it tabled consideration of the application until the December Board meeting because the full board was not present.

On December 21, 1999, the Board again considered AT&T's "use" variance application. At the meeting, AT&T's attorney, Lauren Cato, elaborated on the study results, stating, "although AT&T would pre-

fer to use an existing structure and a unipole, another option [is] to file an application to build a new tower in a district zoned for wireless antennas." Board members read letters supporting AT&T's application from neighboring businesses into the record. The Board also recorded the City Inspector's recommendation to deny the variance for failure to show unnecessary hardship. During the meeting, the Board learned that it had failed to give required public notice of the hearing to abutting property owners. As a result of having failed to give proper notice of the hearing, the Board again tabled the application until the next Board meeting so that the Board could give the required notice.

The Board again considered AT&T's application on January 18, 2000. AT&T's representative, Mr. Riley, discussed the search ring results again, saying that "there was not a less obtrusive location for this facility and the only alternative site identified for a tower was Ferndale City Hall." He further indicated that "AT&T had not contacted the City to discuss this alternative because the Ordinance did not allow a free-standing tower unless any and all possibilities for use of an existing structure had been eliminated." Mr. Riley also explained that AT&T had changed the style of the antenna support structure. AT&T would now house this structure in a round container similar in appearance and size to a small, single-family hot water heater.

The Board read into the record two letters from residents Craig Prisby and Michael Gordon expressing disapproval of the antenna based on aesthetic concerns.[2]

Ultimately, the Board denied the variance request. The Board, however, did not issue any written decision denying the variance request. Instead, it reflected its denial in the meeting minutes. The minutes stated the Board based its decision on "... changes to the character of the neighborhood which would result from construction of the proposed structure, no hardship being justified by the petitioner and the problem being self-created."

On January 27, 2000, Ferndale sent AT&T a letter stating that the Board denied the variance application because the Ordinance "does not permit wireless communication facilities in the C–4 Zoning District (Central Business District)."

In reaction to Ferndale's denial of the variance, Wolf brought a state law suit against Ferndale. On February 11, 2000, Wolf sued Ferndale in Oakland County Circuit Court. It alleged state law claims, saying the Board's actions were arbitrary, capricious and ultra vires, and represented tortious interference with a business relationship. The state court agreed that Ferndale had failed to delineate its justification for denying the variance. On April 18, 2000, the Oakland County Circuit Court held that the Board failed to articulate sufficient reasons for its denial based upon a written record. The court remanded the case to the Board to clarify its reasons for the denial.

The Board clarified its reasons for the denial at a meeting on May 10, 2000, and formally adopted the reasons on May 16, 2000. The May 10, 2000, meeting minutes state the reasons for the denial as follows:

---

**2.** Mr. Prisby's letter stated, in part, "If an antenna is built on top of the building at 27500 Woodward, how will this improve the small town look of Ferndale?" I know that the Downtown Business District prides its appearance, as well as the content, of their stores. This antenna will only make the city look "Big Time" and give Ferndale a different feel. Mr. Gordon stated in his letter that "the tower would ... add to the visual clutter of the Nine Mile–Woodward intersection. Someday I would hope to see a corner with no billboards let alone a communications tower."

1) there was no evidence brought forward that the property could not be reasonably used under the current zoning of C–4; 2) there were no unique circumstances that would allow only this use in this particular area, as admitted by the representative of AWS, as the representative submitted a diagram showing approximately a ½ mile radius of which they could place their monopole which included industrial, medium industrial areas north of Nine and West Hilton (M–1, M–2 and C–3 and government properties) which would allow placement of the monopole and there were alternatives available; 3) the monopole would alter the character of the neighborhood, as the proposed site was located in the Downtown Business District and the monopole was approximately the size, as indicated by the representatives, of a small home water heater to be placed between billboards on the top of a building, which would resemble a factory chimney and would alter the character of the Downtown Shopping District; 4) the problem was self-created as the representatives illustrated to the Board that there were numerous other areas in which a monopole could be placed and though this site was the preferred site, the Board's decision was based on zoning practices and the welfare of the community; and 5) the height of the monopole was such as indicated on the diagrams that would have necessitated a variance on the height as the proposed monopole was in excess of the height requirements in the City's Zoning Ordinance and for those reasons the motion was made to deny the use variance request of AWS.

On June 13, 2000, Wolf filed a federal suit alleging violations of the Act.

### III. Summary of Arguments

Wolf's appeal rests on four arguments. First, it contends that the district court erred when it found that Ferndale's denial of AT&T's zoning variance request was in writing. It also asserts that the district court erred in its finding that substantial evidence supported Ferndale's denial. Wolf next argues that the district court erred when it held that Ferndale's ordinance does not unreasonably discriminate among providers of functionally equivalent services. Finally, Wolf argues that Ferndale's ordinance violates the Act because it prohibits the provision of wireless services.

### IV. Analysis

#### A. Standard of Review

In considering a district court's decision following a bench trial, this court reviews findings of fact under a clearly erroneous standard. *See* Fed.R.Civ.P. 52(a); *Am. Postal Workers Union v. United States Postal Serv.*, 871 F.2d 556, 561 (6th Cir. 1989). We review conclusions of law *de novo. See Affiliated FM Ins. Co. v. Owens–Corning Fiberglass Corp.*, 16 F.3d 684, 686 (6th Cir.1994).

#### B. Telecommunications Act of 1996

The Telecommunications Act of 1996 provides in pertinent part as follows:

> (7) Preservation of local zoning authority
>
> (A) General authority
>
>> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
> (B) Limitations
>
>> (i) The regulation of the placement, construction, and modification of

personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7).

We have observed that "section 332(c)(7) 'is a deliberate compromise between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" *Telespectrum v. Pub. Serv. Comm'n*, 227 F.3d 414, 423 (6th Cir.2000) (quoting *Omnipoint Corp. v. Zoning Hearing Bd.*, 181 F.3d 403, 407 (3d Cir.1999)).

### C. "In Writing" Requirement

As noted above, § 332(c)(7)(B)(iii) is one of four issues in this appeal. Wolf argues that Ferndale's denial of its variance request violated 47 U.S.C. § 332(c)(7)(B)(iii) because the denial was not "in writing" for purposes of the Act. The district court held that the May 10, 2000, meeting minutes[3] met the writing requirement. Further, the court found that even if the May 10 meeting minutes did not amount to a written denial, the January 27, 2000, letter met the writing requirement because the letter "clearly states that AT&T's request was denied."

At the time the parties briefed this issue, we had not defined the Act's "in writing" requirement. Therefore, the parties urge this Court to adopt other courts' interpretations of the phrase. These courts vary in their interpretations. Some hold that a stamping of "denied" on a zoning application satisfies the writing requirement. *See AT&T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 429 (4th Cir.1998). *See also, AT&T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 312–13 (4th Cir.1999). Others hold that a zoning board must issue a decision setting forth the reasons for the decision and linking the reasons to record evidence. *See, e.g., Omnipoint Communications, Inc. v. Planning & Zoning Comm'n*, 83 F.Supp.2d 306, 309 (D.Conn.2000).

We, however, recently defined "in writing" taking a middle-ground approach. *New Par v. City of Saginaw*, 2002 U.S.App. LEXIS 16377, 2002 WL 18422002 WL 481148 235, 2002 Fed.App. 0276P (6th Cir. Aug. 14, 2002). Specifical-

---

**3.** The state court held that Ferndale, via its January 18, 2000, meeting minutes and its January 27, 2000, letter, did not "support … its decision by evidence on the record." The court then remanded the matter to Ferndale's Board of Zoning Appeals to provide a statement of its reasons for the denial. The Board provided this statement in the form of its May 10, 2000, meeting minutes.

ly, this Court held that a denial meets the writing requirement if it "1) [is] separate from the written record; 2) describe[s] the reasons for the denial; and 3) contain[s] a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons." *New Par,* 2002 U.S.App. LEXIS 16377 at *11–12.

Here, three possible writings are at issue. The first is the Board's denial in the January 18, 2000, meeting minutes. The second is the Board's January 27, 2000, letter notifying AT&T that it had denied the variance request because "the Zoning Ordinance 4.39(g)(1)(A) does not permit wireless communication facilities in the C–4 Zoning District." Finally, the May 10, 2000, meeting minutes issued in response to the state court's order for Ferndale to clarify its reasons for the denial is a possible writing. We now examine each alleged "writing" at issue.

The January 18, 2000, meeting record does not satisfy the "in writing" test because it is not separate from the meeting's written record concerning other Board issues. Further, the January 27, 2000, let-

ter does not satisfy the test because it does not contain any explanation of the reasons for the denial.

█ The May 10, 2000, meeting minutes do satisfy the writing requirement.[4] The minutes concern only the denial of the variance, describe the reasons for the denial, and contain a sufficient explanation of the reasons. The issue, however, is whether this writing is an impermissible retroactive cure. Wolf argues that since the May 10, 2000, meeting minutes post-date the Board's denial by more than three months, "the district court improperly permitted a retroactive cure of an existing violation of the Act" when it held that the minutes satisfied the Act's writing requirement. Wolf relies principally on *Virginia Metronet v. Bd. of Supervisors of James City County Virginia,* 984 F.Supp. 966 (E.D.Va.1998) as support for this proposition.

Ferndale responds that it did not retroactively cure a violation of the Act because it did not violate the Act.

In *Virginia Metronet,* the action stemmed from the James City County Board of Supervisor's ("James County

---

4. The May 10, 2000, meeting minutes state the reasons for the denial as follows:

1) there was no evidence brought forward that the property could not be reasonably used under the current zoning of C–4; 2) there were no unique circumstances that would allow only this use in this particular area, as admitted by the representative of AWS, as the representative submitted a diagram showing approximately a ½ mile radius of which they could place their monopole which included industrial, medium industrial areas north of Nine and West Hilton (M–1, M–2 and C–3 and government properties) which would allow placement of the monopole and there were alternatives available; 3) the monopole would alter the character of the neighborhood, as the proposed site was located in the Downtown Business District and the monopole was approximately the size, as indicated by the representatives, of a small home water heater to be placed between billboards on the top of a building, which would resemble a factory chimney and would alter the character of the Downtown Shopping District; 4) the problem was self-created as the representatives illustrated to the Board that there were numerous other areas in which a monopole could be placed and though this site was the preferred site, the Board's decision was based on zoning practices and the welfare of the community; and 5) the height of the monopole was such as indicated on the diagrams that would have necessitated a variance on the height as the proposed monopole was in excess of the height requirements in the City's Zoning Ordinance and for those reasons the motion was made to deny the use variance request of AWS.

Board") denial of Virginia Metronet's special use variance application to construct a telecommunications tower in the region. *Virginia Metronet*, 984 F.Supp. at 968. The James County Board stated its reasons as follows:

Individual Board members spoke to the reasons for denial such as the visibility of the entire tower because it is sited in an open field; residents persistent in not wanting tower in neighborhood; and the belief that there is a more appropriate site for a tower in the vicinity.

*Id.* at 970.

The James County Board did not provide any other reasons for its denial. *Id.* Virginia Metronet sued the James County Board, alleging among other claims, a violation of the Act's requirement that the denial be "in writing." *Id.* Six days after Virginia Metronet filed the complaint and thirty-four days after the Board denied the application, a member of the Planning Commission sent Virginia Metronet a letter detailing the reasons for the application's denial. *Id.* at 970.

The *Virginia Metronet* Court found that delay in issuing this letter gave "rise to an inference that the letter was created merely to provide substance to the conclusory statements contained in the minutes of the meeting." *Id.* at 973. The Court then noted that "[t]o allow governing bodies to satisfy the requirements of [the Act] by submitting 'reasons' after a challenge is mounted is to allow for the evasion of substantive review, contrary to Congressional intent." *Id.* The Court, however, did not need to resolve the case on the timing issue. Instead it held that the letter, no matter its timing, did not satisfy the "in writing" requirement because the letter consisted of mere conclusory statements. *Id.*

Here, this Court must resolve the timing issue because the meeting record otherwise satisfies the writing requirement. Ferndale alleges that *Virginia Metronet* is distinguishable because the zoning board there did not send its written denial until after the complainant sued. Here, Ferndale continues, it sent its written denial to AT&T before Wolf filed its lawsuit on June 13, 2000.

We are uncertain which written denial Ferndale is referring to, the January 27 letter or the May 10 meeting minutes. If Ferndale is referencing the January 27 letter, this argument fails because, as discussed above, this letter does not satisfy the writing requirement. If Ferndale is pointing to the May 10 meeting minutes, the argument still fails because the Board prepared these minutes in response to the state court's order. Therefore, while the Board prepared the minutes before the federal litigation, it did not prepare them until after Wolf filed the state court action. Accordingly, like the *Virginia Metronet* plaintiff, Wolf had to sue to force the Board to give reasons for its denial of the variance.

We find persuasive the *Virginia Metronet* Court's logic that allowing retroactive cure of a deficiency thwarts Congress's intent. Therefore, we hold that the May 10 meeting minutes do not satisfy the writing requirement because the Board issued the minutes solely in response to a state court order after Wolf sued.

Even assuming *arguendo*, that the May 10 meeting minutes do satisfy the writing requirement, Ferndale still violated the Act because the written record does not contain substantial evidence supporting the Board's decision. We discuss this issue below.

### D. Substantial Evidence Requirement

Wolf also argues that the Board's denial lacks substantial evidence in the record to

support it. Section 332(c)(7)(B)(iii) provides that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." "[T]he 'substantial evidence' standard of section 332 is the traditional standard employed by the courts for review of agency action." *Telespectrum*, 227 F.3d at 423; *see also* H.R. Conf. Rep. No. 104–458 (1996) (stating "the phrase, 'substantial evidence contained in the written record' is the traditional standard used for judicial review of agency actions").

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "This Court reviews the entire record, including evidence opposed to the result of the decision." *Telespectrum*, 227 F.3d at 423 citing *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981).

Before we determine if the record contains substantial evidence supporting the Board's decision, we first discuss Michigan zoning law.

■ Two categories of variances exist, use variances and nonuse variances. *See Nat'l Boatland, Inc. v. Farmington Hills Zoning Bd. of Appeals*, 146 Mich.App. 380, 387, 380 N.W.2d 472 (1985). Use variances involve a request for the change in the use of a property. *Heritage Hill Ass'n, Inc. v. Grand Rapids*, 48 Mich.App. 765, 211 N.W.2d 77 (1973).

Nonuse variances include enlarging or altering nonconforming uses. *Id.* at 387, 211 N.W.2d 77 Rathkopf. *The Law of Zoning and Planning* p 38–1 (4th ed. 1979). Generally, a nonconforming use encompasses " 'the physical characteristics, dimensions, or location of a structure as well as the functional use thereof ... and includes nonconforming use of nonconforming structures.' " *Nat'l Boatland*, 146 Mich.App. at 385, 380 N.W.2d 472 (citations omitted) (noting that the outdoor storage of boats on land otherwise used according to zoning regulations is a nonconforming use).

As the Court of Appeals for the State of Michigan has held:

> Nonconforming use can mean several related things: "A 'nonconforming use' comprehends the physical characteristics, dimensions, or location of a structure as well as the functional use thereof or of the premises on which it is located, and is used as a generic term that includes nonconforming use of conforming structures and plots, nonconforming use of nonconforming structures and plots, and conforming use of nonconforming structures and plots." (Footnotes omitted.)

*Id.* at 385, 380 N.W.2d 472.

In Michigan, the standards for reviewing an application for a use variance differ from the standards used to review an application for a nonuse variance. Because the standards differ, we must decide whether AT&T applied for a use variance or a nonuse variance. In Michigan, a local zoning board of appeals may grant administrative relief from the strict application of the ordinance through variances. MCL 125.585(9); MSA 5.2935(9); *Paragon Props. Co. v. City of Novi*, 452 Mich. 568, 550 N.W.2d 772 (1996). Section 22.07 of the Ordinance authorizes the Board to grant use and nonuse variances "[w]here there are practical difficulties or unneces-

sary hardships in complying with the provision of the ordinance."

The showing needed to satisfy the variance requirements depends on the type of variance the applicant seeks. One requesting a use variance must show unnecessary hardship, while the standard for a nonuse variance is practical difficulty. *Puritan–Greenfield Improvement Ass'n v. Leo,* 7 Mich.App. 659, 666–67, 153 N.W.2d 162, 166 (1967).

Wolf argues that the district court improperly characterized AT&T's request as a use variance instead of a nonuse variance.[5] Wolf reasons that AT&T's request was a nonuse variance because the Building already houses a cellular antenna. Accordingly, Wolf claims the district court erroneously applied the unnecessary hardship standard to AT&T's variance request. Ferndale does not address this issue in its briefs.

The district court based its classification on the fact that the parties stipulated that the variance request was for a use variance. Further, the Ordinance does not permit wireless facilities in the C–4 district. The district court dismissed Wolf's arguments that AT&T applied for a nonuse variance because the building already houses an Air Touch antenna, reasoning:

> That Defendant may be tolerating one potentially-illicit structure on Plaintiff's property does not alter the syllogism that a use variance seeks to allow what the zoning ordinance forbids, AT&T sought to erect an antenna forbidden by Defendant's ordinance, and AT&T therefore sought a use variance.

A wireless service provider's request to add three new antennas to its existing nonconforming tower is a nonuse variance

request. *Century Cellunet of S. Michigan Cellular v. Summit Township,* 250 Mich. App. 543, 2002 Mich.App. LEXIS 491, 2002 WL 481148 (2002).

In *Century Cellunet,* Century Cellunet ("Cellunet"), a wireless service provider, built a communications tower with six attached antennas in Summit Township's general commercial district. *Id.* 655 N.W.2d at 247. At the time of the tower's construction, the local zoning ordinance allowed cellular tower placement in the general commercial district. *Id.* 655 N.W.2d at 247–48. The township subsequently amended the ordinance to ban such towers in the commercial district and Cellunet's tower became a nonconforming use. *Id.*

After the ordinance's amendment, Cellunet sought to install three new antennas on the tower and to replace the six existing antennas with smaller, more powerful antennas. *Id.* Cellunet needed the additional antennas to provide personal communications services not supported by the existing antennas. *Id.* The Summit Township zoning board treated the request as a nonuse variance because it was an application to expand a nonconforming use. *Id.* The *Cellunet* zoning board reasoned:

> It is the position of a majority of the members of the Board that the use of the applicant's structure, as distinguished from the structure itself, is nonconforming, and that the applicant was requesting an enlargement, expansion, or alteration of such non-conforming use.

*Id.* a655 N.W.2d at 249–51, WL *1. On appeal, the Court upheld the classification of the application as a nonuse variance and affirmed the zoning board's reasoning. *Id.* 655 N.W.2d at 248–49.

---

**5.** The district court deemed this to be "an issue of law." We therefore review the district court's decision *de novo. See Affiliated*

*FM Ins. Co. v. Owens–Corning Fiberglass Corp.,* 16 F.3d 684, 686 (6th Cir.1994).

In reaching this result, the *Cellunet* court noted:

> § 5.7.3, which governs nonconforming uses, provides, in pertinent part: Where, on the date of adoption or amendment of this Ordinance, a lawful use of a structure exists that is no longer permissible under the regulations of this Ordinance ... The ZBA determined, as a factual matter, that petitioner's telecommunications tower qualified as a nonconforming use under § 5.7.3. Applying that section of the zoning ordinance, the ZBA concluded that petitioner was requesting an "enlargement, expansion, or alteration" of its nonconforming use ... Petitioner's proposal includes the addition of three new antennas to its tower. Despite the fact that these antennas would be smaller than the antennas currently attached to the tower, their addition would clearly increase the number of antennas present ... Given petitioner's request to add three new antennas to its tower array, the ZBA's decision that petitioner sought to expand its nonconforming use was supported by competent, material, and substantial evidence.

*Id.* 655 N.W.2d at 248–49.

Based upon the above reasoning, we conclude that the Board and the district court should have treated AT&T's variance request as a nonuse variance. AT&T's antenna request is not a request to change the use of Wolf's property because the Building has an existing Air Touch rooftop antenna. Ferndale contends that, to the best of its knowledge, Air Touch placed this antenna on the Building before the Ordinance's enactment. Like the *Cellunet* ordinance, Ferndale's Ordinance contains a provision about nonconforming use. Specifically, the provision states:

> Any lawful use of the land or buildings existing at the date of passage of this ordinance and located in a district in which it would not be permitted as a new use under the regulations of this ordinance is hereby declared to be a "nonconforming use" and not in violation of this ordinance at the date of adoption of this ordinance.

Therefore, this antenna is a nonconforming use under the Ordinance. AT&T sought to expand the nonconforming use by adding another antenna to the roof. AT&T did not request a variance from the Ordinance's provision that Ferndale can administratively approve only one antenna per structure as the Ordinance is silent as to the procedure for siting more than one antenna on an existing structure. The Building is not in a zone that permits administrative approval of wireless facilities and the record does not contain any evidence that Ferndale ever administratively approved Air Touch's antenna. Therefore, the best characterization of AT&T's application is as a request to expand a nonconforming use. The Building houses a nonconforming Air Touch antenna. AT&T sought to expand this nonconforming use by siting another antenna on the roof.

We note that the *Cellunet* provider both created the nonconforming use and sought to expand the use. Here, however, Air Touch created the nonconforming use and AT&T, a different wireless provider, seeks to expand the use. We find this distinction irrelevant. In both cases, a provider seeks to add additional antennas to a nonconforming use wireless facility.

We agree that the application would be a use variance if the Building did not currently have a wireless service facility on its roof. However, the Building does have a rooftop wireless antenna. The district court ignored the effect of this antenna. We cannot. We hold therefore that AT&T requested a nonuse variance because it

sought to expand a nonconforming use. In reaching this decision, we reject Ferndale's argument that because the parties stipulated at trial that the application is a use variance, it is therefore a use variance. This argument places form over substance. No matter how the parties labeled the application, it is, in substance, an application to expand a nonconforming use. Moreover, AT&T classified the request as a use variance at the Board's instruction, not because it believed that the request was a use variance. Therefore, we hold that the district court erred in classifying the variance application as a use variance.

■ Having determined AT&T's application to be a nonuse variance request, we turn to the proper standards for granting such a request. One requesting a nonuse variance need only show practical difficulties in following the ordinance rather than showing unnecessary hardship. *Nat'l Boatland,* 146 Mich.App. at 387, 380 N.W.2d 472; *Heritage Hill Ass'n,* 48 Mich. App. at 768, 211 N.W.2d 77; *Indian Village Manor Co. v. Detroit,* 5 Mich.App. 679, 147 N.W.2d 731 (1967).

Michigan law has not established criteria for showing practical difficulty. *Nat'l Boatland.* 146 Mich.App. at 387, 380 N.W.2d 472. However, some courts have suggested that the property owner must show that the problem is unique to his land, not shared by all others. *Tireman–Joy–Chicago Improvement Ass'n v. Chernick,* 361 Mich. 211, 216, 105 N.W.2d 57 (1960); *George v. Harrison Township,* 44 Mich.App. 357, 205 N.W.2d 254 (1973).

Other courts have not followed this principle. Instead, one court found practical difficulty to exist where a row of trees obstructed the view of a sign behind them. *Indian Village Manor Co.,* 5 Mich.App. at 683–85, 147 N.W.2d 731. This difficulty supported the grant of a variance to place the sign in front of the trees and encroach onto neighboring property. *Id.* Another court found practical difficulty where the owner of a private home failed in selling the property. *Heritage Hill Ass'n, Inc.,* 48 Mich.App. at 771, 211 N.W.2d 77. This practical difficulty justified a variance to demolish the building so that a church could use the land for a planned expansion. *Id.* Finally, at least one court applied a three-factor balancing test. *Nat'l Boatland,* 146 Mich.App. at 388–391, 380 N.W.2d 472. According to this court, the factors to be considered and weighed in determining whether practical difficulty exists are as follows:

1) Whether compliance with the strict letter of the restrictions governing area, set backs, frontage, height, bulk or density would unreasonably prevent the owner from using the property for a permitted purpose or would render conformity with such restrictions unnecessarily burdensome.

2) Whether a grant of the variance applied for would do substantial justice to the applicant as well as to other property owners in the district, or whether a lesser relaxation than that applied for would give substantial relief to the owner of the property involved and be more consistent with justice to other property owners.

3) Whether relief can be granted in such fashion that the spirit of the ordinance will be observed and public safety and welfare secured.

*Id.* at 388, 380 N.W.2d 472.

We believe that the balancing test provides the best approach to determining whether practical difficulty exists and now turn to applying this test. The first factor, however, does not apply here. AT&T did not request a variance from set back, density or frontage requirements. Instead, it

sought to expand a nonconforming use by adding another antenna.

AT&T does meet the second and third factors. Granting AT&T's variance request would do substantial justice to Wolf because it would ensure that it uses the Building for the placement of an AT&T wireless antenna. This is a use for which the property is uniquely suited. AT&T's representatives stated that the search ring study showed that the Building is the only suitable existing structure on which to place its antenna. Beyond siting the antenna on the Building's roof, the only alternative is to build a free-standing tower at the City Hall site. At oral arguments, Wolf's attorney stated that building a tower costs much more than siting a rooftop antenna. Further, a 100–feet tower is more intrusive than a rooftop antenna. Allowing AT&T's variance request would also do substantial justice to the other property owners because it prevents the proliferation of new towers in the district, an interest recognized in the Ferndale Ordinance.

AT&T also meets the third factor which closely relates to the second. As discussed, the approval of the variance request would enable AT&T to put its antenna on an existing structure eliminating the need to build a new tower. It would also allow two wireless providers, AT&T and Air Touch, to jointly use an existing wireless facility site, the Building's roof. This comports with the Ordinance's spirit and purpose to "minimize the number of towers throughout the community" and "strongly encourage the joint use of new and existing tower sites as a primary option rather than construction of additional single-use towers." Further, AT&T claimed its antenna would not jeopardize

the public safety and welfare. AT&T therefore satisfies the practical difficulty standard.

Having determined that AT&T meets the practical difficulty variance standard, we examine other Ordinance requirements for granting a variance.[6] Besides requiring an applicant to show practical difficulty, the Ordinance provides that a variance applicant must meet the following four standards:

1. The proposed use will be of such location, size and character that it will be in harmony with the appropriate and orderly development of the surrounding neighborhood.

2. The proposed use will be of a nature that will make vehicular and pedestrian traffic no more hazardous than is normal for the district involved taking into consideration vehicular turning movements in relation to routes of traffic flow, proximity and relationship to intersections, adequacy of sight distances, location and access of off-street parking and provisions for pedestrian traffic, with particular attention to minimizing child-vehicle contacts in residential districts.

3. The location, size, intensity, site layout and periods of operation of any such proposed use will be designed to eliminate any possible nuisance emanating therefore which might be noxious to the occupants of any other nearby permitted uses, whether by reason of dust, noise, fume, vibration, smoke or lights.

4. The location and height of buildings or structures and the location, nature and height of walls and fences

---

**6.** Because we conclude that the practical difficulty standard applies, we do not consider the parties' arguments about whether substantial evidence existed to satisfy the undue hardship standard.

will not interfere with or discourage the appropriate development and use of adjacent land and buildings, or unreasonably affect their value.

We conclude that the record contains no evidence about these four requisite Ordinance findings that could weigh against AT&T's variance request. The record fails to show that the antenna will not be in harmony with the development of the surrounding neighborhood. We note that while the Board and two Ferndale citizens expressed general aesthetic concerns about the antenna, such generalized aesthetic concerns are insufficient to deny a wireless provider's variance request. *See New Par*, 2002 U.S.App. LEXIS at *19, 2002 WL at *7.

As for the second factor, the proposed antenna would not affect vehicular traffic and the antenna would not be a nuisance. The Board did not present evidence to refute this. Further, the Board did not present any evidence that the antenna would negatively affect adjacent property values, and we find no such evidence in the record. Finally, we find no evidence in the record that the antenna will interfere with the appropriate development and use of the adjacent buildings. To the contrary, neighboring businesses wrote letters to the Board supporting AT&T's variance request.

Instead of presenting evidence on the four requisite variance standards, the Board based its denial on five other unrelated reasons. First, AT&T presented no evidence that Wolf could not reasonably use the property under the current zoning. Next, AT&T failed to show unique circum-

stances. Third, the antenna would alter the character of the neighborhood. Fourth, the problem was self-created. Finally, the height of the monopole would have required a variance from the district's height requirements.

The first, second, and fourth reason all relate to a showing of unnecessary hardship.[7] The Ordinance, however, does not contain the unnecessary hardship criteria. These criteria stem from Michigan case law and only apply when an applicant requests a use variance. But as discussed above, AT&T's request was for a nonuse variance, not a use variance. A nonuse variance applicant does not need to show unique circumstances or that no other suitable location exists. Therefore, these concerns do not go to any of the Ordinance's criteria governing nonuse variance requests and are irrelevant in considering AT&T's variance request. *See New Par*, 2002 U.S.App. LEXIS at 13–14, 2002 WL at *7 (interpreting a similar zoning ordinance and holding that a zoning board's concern about whether a wireless provider could locate a proposed tower on an alternative site "does not go to any of the criteria set out in the Zoning Code regarding when the Board can grant a variance"). Accordingly, we find that the record does not contain substantial evidence to support the Board's first, second, and fourth reasons.

The third concern sounds in aesthetics. The Board's meeting record refers to the aesthetic concerns of two citizens. The Board also raised similar issues based on computer-simulated before and after im-

7. Under Michigan law, to establish undue hardship "the record must show: 1) that the land cannot yield a reasonable return if used only for a purpose allowed in that zone, 2) that the plight of the owner is due to unique circumstances and not to the general conditions of the neighborhood, 3) that the use sought will not alter the essential character of the neighborhood, and 4) the problem is not self-created." *Puritan–Greenfield Improvement Assoc. v. Leo*, 7 Mich. 659, 675, 153 N.W.2d 162 (1967); *Tireman–Joy–Chicago Improvement Assoc. v. Chernick*, 361 Mich. 211, 105 N.W.2d 57 (Mich.1960).

ages. We, however, have adopted the principle that a " 'few generalized expressions of concern with "aesthetics" cannot serve as substantial evidence on which ... [to] base [wireless permit] denials.' " *New Par*, 2002 U.S.App. LEXIS at *19, 2002 WL at *7. Here, only two citizens complained about the antenna's visual impact. We conclude, therefore, the record lacks sufficient evidence to support the Board's third reason, the altering of the character of the neighborhood.

Substantial evidence in the record does not support the Board's final reason. Although AT&T would need to get a height variance for its monopole, the record contains no evidence that the monopole's height would have violated any of the four Ordinance criteria specified above.

In summary, because AT&T satisfies the practical difficulty standard and no evidence exists that would weigh against granting the variance, we conclude that the record does not contain substantial evidence supporting the Board's denial of AT&T's variance request.

### E.   Unreasonably Discriminate

Wolf contends that the district court erred when it found that the Ordinance does not unreasonably discriminate. Subsection 332(c)(7)(B)(i)(I) prohibits local governments from "unreasonably discriminating among providers of functionally equivalent services." Wolf argues that the Ordinance creates a monopoly. It alleges that this monopoly arises from the fact that the Ordinance restricts "permitted uses" to city owned or controlled property and requires administrative approval or special permits for wireless facilities on private property. This argument, however, ignores the fact that AT&T already has two wireless facilities in Ferndale.

Wolf also asserts that the Ordinance "gives Ferndale an unfair competitive ad-

vantage over other owners of potential tower sites." This claim is misguided. The Act prohibits unreasonable discrimination among functionally equivalent service providers, not potential wireless facility site owners.

Finally, Wolf argues that "[r]efusing a competitor entry into a market simply because other services already exist" constitutes unreasonable discrimination. Wolf reasons that allowing Air Touch to site an antenna on the Building while denying AT&T's request after subjecting AT&T to more stringent administrative hoops is unreasonable discrimination.

Ferndale counters that the Board did not unreasonably discriminate against AT&T because the Ordinance allows AT&T the "opportunity to construct its proposed facility at another site near to its proposed location."

Courts have interpreted § 332(c)(7)(B)(I)(i) to mean that the Act does not bar all discrimination among providers but only discrimination that is unreasonable. *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 638–39 (2d Cir.1999); *City Council of Virginia Beach*, 155 F.3d at 427. The legislative history of the act makes this clear:

> The phrase "unreasonably discriminate among providers of functionally equivalent services" will provide localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities provide functionally equivalent services. For example, the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit for a competitor's 50–foot tower in a residential district. H.R. Conf. Rep. No. 104–458, at

208 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 222.

■ Therefore, a municipality may not affirmatively grant preferential treatment to one provider over another. *See Aegerter v. City of Delafield*, 174 F.3d 886, 892 (7th Cir.1999); *City Council of Virginia Beach*, 155 F.3d at 427 (finding no evidence that city council had any intent to favor one company over another). A plaintiff, however, must show more than mere unequal treatment between itself and its competitor to show that a municipality granted preferential treatment. *Smart SMR v. Zoning Comm'n of Stratford*, 995 F.Supp. 52, 59 (D.Ct.1998); *APT Minneapolis, Inc. v. Eau Claire County*, 80 F.Supp.2d 1014, 1024 (W.D.Wi.1999).

In *Eau Claire County*, a wireless service provider argued that the zoning board's denial of its variance application kept it from competing with other cellular operators already providing service in the Eau Claire area. *Eau Claire County*, 80 F.Supp.2d at 1024. The court rejected this argument, reasoning:

"Plaintiff does not contend that other providers of wireless telecommunication services have applied for such a variance. Without more, the fact that the cellular companies are apparently able to provide coverage in the Eau Claire area without the need for special permits from the board (presumably because their antennas are shorter) falls far short of establishing a claim of unreasonable discrimination." *Id.* at 1024.

Likewise, here the record contains no evidence that Ferndale affirmatively gave Air Touch a variance. Ferndale alleges that Air Touch sited its antenna before the Ordinance's enactment. Conversely, Wolf alleges that Ferndale affirmatively gave Air Touch a variance. Wolf, however, has presented no evidence to support this allegation. Therefore, we find that Ferndale

did not unreasonably discriminate among functionally equivalent service providers.

F. Prohibit Provision of Personal Wireless Services

■ Section 47 U.S.C. § 332(c)(7)(B)(i)(II) provides that "The regulation of the placement ... of personal wireless service facilities by any ... local government ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." Wolf argues that the Ordinance effectively prohibits the provision of wireless services because it restricts "permitted use" wireless communication facilities to city-owned or controlled property. Further, the Ordinance only allows placement of such facilities in other locations upon either administrative approval or a variance exemption. Therefore, Wolf asserts that the Ordinance effectively prohibits those who choose not to deal with the City from providing wireless services.

Conversely, Ferndale asserts that the Ordinance has not prohibited AT&T from providing wireless services because it already has two existing wireless service facilities in Ferndale. Ferndale also argues that the Act does not require it to approve multiple wireless facilities at one site. Instead, according to Ferndale, the Act preserves Ferndale's discretion to impose zoning limitations aimed at addressing tower density.

The intent of Section 332(c)(7)(B)(I)(II) is "to limit general bans of personal wireless services, or policies which have the effect of prohibiting personal wireless services." *AT&T Wireless PCS, Inc. v. City Council of the City of Virginia Beach*, 979 F.Supp. 416, 426–27 (E.D.Va.1997). Moreover:

[T]he scope of § 332(c)(7)(B)(I)(II) is not limited to general prohibitions, moratori-

ums, bans, or other similarly expressly hostile limitations on the siting of personal wireless service facilities. Policies that are facially neutral may have the effect of prohibiting service if those policies, despite being objectively administered in accordance with state and local law and the further requirements of the [Act] have the necessary result that all possible sites in a given area will be rejected.

*Virginia Metronet, Inc.,* 984 F.Supp. at 971.

In *Virginia Metronet,* a provider argued that the municipality effectively prohibited the providers services by denying a permit in an area that was unserved by wireless facilities. *Virginia Metronet,* 984 F.Supp. at 970–71. The Court rejected this claim because the wireless provider had not shown that the wireless facility zoning ordinance "would *necessarily* have resulted in the denial of any application in the area sought to be served." *Id.* at 971 (emphasis added). Instead, according to the court, "the Plaintiffs offered evidence that the Board's application of their policies was hostile and therefore not supported by substantial evidence, they have not offered evidence that the policies themselves precluded the approval of any application." *Id.*

Similar to the plaintiff in *Virginia Metronet,* Wolf has not shown that the Ordinance necessarily results in the denial of any application. To the contrary, AT&T currently provides wireless services in Ferndale and has two existing wireless facilities in Ferndale. This shows that the Board does approve applications under the Ordinance. Moreover, the Ordinance does not prohibit placement of wireless service facilities on all private properties. Instead, it limits such facilities to certain zoning districts and requires administrative approval. No evidence exists in the

record to suggest that Ferndale has consistently denied such administrative approvals. Therefore, the record contains no evidence that the Ordinance effectively prevents wireless communication services. Accordingly, we hold that the Ordinance does not effectively prohibit the provision of personal wireless services.

### G. Burden of Proof

Ferndale filed a cross-appeal alleging that the district court erred in concluding that the administrative agency denying a wireless service facility permit bears the burden of proof on appeals. The district court reasoned that putting the onus on the applicant is inconsistent with the statute and Congress' intent. According to the district court, it is easier for the denying agency who created the record to show that substantial evidence in the record supported its denial. Conversely, an applicant bearing the burden of proof "would have to prove a negative on the basis of a record that it did not create."

We have not previously addressed this issue. Regardless of which party bears the burden of proof, the record does not contain the necessary substantial evidence supporting the Board's decision to rule in its favor. Therefore, we shall not address this issue.

### V. Conclusion

Because we hold that the Board's denial was both not in writing and not based upon sufficient evidence in the record, we reverse the district court's judgment for Ferndale on these issues. However, we hold that the district court did not err when it found that the Ordinance does not unreasonably discriminate among functionally equivalent wireless service providers. We also hold that the district court did not err when it found that the Ordinance does not effectively prohibit the provision of

wireless services. Because we conclude that substantial evidence supporting the Board's decision is lacking irrespective of which party bears the burden of proof, we do not address the burden of proof issue. For the foregoing reasons, we AFFIRM in part and REVERSE in part the judgment of the U.S. District Court for the Eastern District of Michigan.

This care is hereby REMANDED to the United States District Court for the Eastern District of Michigan for rulings consistent with this opinion.

KRUPANSKY, Circuit Judge, concurring in part and dissenting in part.

I would affirm the district court's well-reasoned opinion that defendant, City of Ferndale ("Ferndale"), did not violate the requirements of the Telecommunications Act of 1996 ("Act").

Contrary to the majority opinion, this court should conclude that the defendant complied with the "in writing" requirement of the Act. In addition, because the defendant introduced the required substantial evidence to support its denial of the requested "use variance," this appellate review needs to determine the assignment of the burden of proof to the appropriate party, which the majority refuses to address. Consequently, I would concur with the district court's finding that the defendant municipality must assume the burden of proof in matters of challenge and appeal under the Act and, accordingly, deny Ferndale's cross-appeal challenging the district court's conclusion on this issue. Finally, I agree with the majority that the defendant's city ordinance did not unreasonably discriminate among functionally equivalent service providers or effectively prohibit the provision of wireless service.

This dispute involved whether the Ferndale Board of Zoning Appeals ("BZA") should issue the necessary "use permit" to AT&T Wireless Services ("AWS") to construct a new wireless telecommunications tower on a building owned by the plaintiff, Laurence Wolf ("Wolf").[1] Wolf's building already had a telecommunications tower upon its roof that was a nonconforming use under the city's current zoning ordinance. AWS conceded, in its revised site plan and at meetings of the BZA, that while Wolf's building met the engineering criteria for the necessary site, alternative sites were available.[2] The BZA denied the AWS petition for a "use variance" in a letter on January 27, 2000 and, under a state court remand, provided written reasons for the denial on May 10, 2000. The BZA found that Wolf could not support a conclusion of unnecessary hardship for a use variance because:[3]

1. Under Section 4.39 of Ferndale's zoning ordinance, cellular towers are considered a "permitted use" only on property owned, leased or controlled by the City. In its effort to upgrade reception service in the area. AWS determined that plaintiff Wolf's building was a feasible site on which to construct a cellular tower. Wolf's property, in Ferndale's central business district, is zoned C–4 and required a variance from the city for the tower construction.

2. In a hearing before the Board. AWS's representative "expressed that although AT&T would prefer to use an existing structure and a unipole, another option was to file an application to build a new tower in a district zoned for wireless antennas." (Minutes of Board Hearing of Dec. 21, 1999). In its January 6, 2000. Revised Site Plan, submitted to the Board, AWS conceded that "[b]y granting the variance, AWS will not have to build a free-standing tower within close proximity to the proposed location." (J.A. at 170) Despite these statements. Wolf provided no evidence that AWS pursued the tower option.

3. The city ordinance does not define "unnecessary hardship," but the building inspector used the following criteria in making his assessment:

(1) there was no evidence brought forward that the property could not be reasonably used under the current zoning of C–4;

(2) there were no unique circumstances which existed that would allow only this use in this particular area, as admitted by the representative of AWS, as the representative submitted a diagram showing approximately a½ mile radius of which they could place their monopole which included industrial, medium industrial areas north of Nine and West Hilton (M–1, M–2 and C–3 and government properties) which would allow placement of the monopole and there were alternatives available;

(3) the monopole would alter the character of the neighborhood, as the proposed site was located in the Downtown Business District and the monopole was approximately the size, as indicated by the representatives, of a small home water heater to be placed between billboards on the top of a building which would resemble a factory chimney and would alter the character of the Downtown Shopping District;

(4) the problem was self-created as the representatives illustrated to the Board that there were numerous other areas in which a monopole could be placed and though this site was the preferred site, the Board's decision was based on zoning practices and the welfare of the community; and

(5) the height of the monopole was such as indicated on the diagrams that would have necessitated a variance on the height as the proposed monopole was in excess of the height requirements in the City's Zoning Ordinance and for those reasons the motion was made to deny the use variance request of AWS.

In response, Wolf filed the instant action in the District Court for the Eastern District of Michigan—Southern Division. First, Wolf alleged Ferndale violated two provisions of § 704 of the Telecommunications Act of 1996, codified as 47 U.S.C. § 332(c)(7), specifically § 332(c)(7)(B)(i) (barring regulations that prohibit the provision of personal wireless services) and § 332(c)(7)(B)(iii) (requiring decisions by local authorities to be in writing and supported by substantial evidence contained in a written record).[4] Second, Wolf alleged

---

1) The property in question cannot be put to a reasonable use if permitted to be used only for purposes allowed in the district in which it is located;
2) The plight of the property is due to unique circumstances peculiar to the property and not to general neighborhood conditions;
3) The use variance, if granted, would not alter the essential character of the area or neighborhood; and
4) The problem is not self-created.

**4.** The relevant portions of § 704 of the Telecommunications Act of 1996 are:
(7) Preservation of local zoning authority
(A) General authority
Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a state or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
(B) Limitations
(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
(I) shall not unreasonably discriminate among providers of functionally equivalent service; and
(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

that Ferndale's zoning ordinance, § 4.39 regulating wireless communications facilities, violated the Act by discriminating against providers of equivalent services, effectively prohibiting personal wireless services.

Subsequent to a bench trial, the district court affirmed Ferndale's denial of AWS' application for a "use variance." The district court opined that by providing AWS with a copy of the May 10, BZA minutes delineating the reasons for denial, the Board met the Act's requirement that such a denial "shall be in writing and supported by substantial evidence *contained in a written record.*" (emphasis added) As to Wolf's market discrimination claim, the district court concluded that, "[w]here, as here, a zoning ordinance allows a wireless-communications provider the opportunity to construct its proposed facility at another site near to its proposed location, there is no refusal of market entry and thus no discrimination." Likewise, the district court concluded that Ferndale's zoning ordinance did not prohibit AWS from providing wireless services in its jurisdiction, noting that AWS already provided wireless services in that area. Finally, adopting the *prevailing opinion among courts* considering the issue, the district court concluded that the Act shifted the burden of proof to the agency denying the applicant's siting request, reasoning, further, that the municipality could more easily provide the substantial evidence in the record to support its denial.

*In reversing only the district court's finding for Ferndale under 47 U.S.C. §§ 332(c)(7)(B)(i) & (ii), the majority opinion asserts that defendant failed to satisfy the Act's "in writing" requirement.* First, the majority maintains that the BZA's explanation for denial, of May 10, 2000, did not comply with the writing requirement "because the Board issued the minutes solely in response to a state court order after Wolf sued."[5] Second, the majority asserts that Ferndale did not satisfy the writing requirement because it failed to provide the substantial evidence necessary to overcome plaintiff's demonstration of need; Ferndale's "failing" arises only as a result of the majority opinion's questionable reclassification of AWS' building application, from the stipulated "use variance" requiring proof of "undue hardship," to a request for a "nonconforming use variance" requiring a lesser evidentiary burden of "practical difficulty."

Initially, the majority argues that the BZA's May 10 meeting minutes amounted to an "impermissible retroactive cure," that failed to satisfy the Act's "in writing" requirement. *The opinion reaches this decision solely upon the reasoning of Virgi-*

---

(ii) A State or local government ... shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time ... taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record ... 47 U.S.C. § 332(c)(7).

5. The majority opinion concedes that the Ferndale Board's May 10, 2000 explanation complies with the Act's "in writing" requirement. As this court has recently concluded, for notice to be considered "in writing" it must issue from the local board as a "written denial separate from the written record," it must "contain a sufficient explanation of the reasons" for the denial to "allow a reviewing court to evaluate the evidence in the record." *New Par v. City of Saginaw,* 301 F.3d 390, 395 (*quoting and adopting Southwestern Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 60 (1st Cir.2001)). Ferndale's BZA minutes meet the criteria established in *New Par.*

*nia Metronet v. Board of Supervisors of James City County Virginia*, 984 F.Supp. 966 (E.D.Va.1998). Not only would the majority's determination have the unfortunate consequence of rendering meaningless any corrective response to a judicial remand of administrative law decisions, the court's legal position relies entirely on *Virginia Metronet's* misinterpretation of the requirements of 47 U.S.C. § 332(c)(7).[6]

*Virginia Metronet* also involved a dispute over whether a municipality had provided written notice of its decision to deny plaintiff's special-use application to construct a telecommunications tower on property located within the municipality. However, it is obviously distinguished from the instant action in that *a city employee, not a member of the Board, noticed Virginia Metronet in a letter detailing the Board's reasons for the denial of its application six days after Metronet filed its action against the municipality's denial of Metronet's application. Id.* at 970. The court articulated two concerns: *the letter of explanation was tendered by a non-voting city employee and the letter was drafted thirty-four days after the application was denied, thus ignoring the thirty day statute of limitations imposed by the Act.* The court concluded the timing "contrary to Congressional intent."[7]

The majority opinion has attempted to tailor the facts of the instant case to conform with only the facts common to both

actions (i.e. that the cases sought to consider if a municipality had provided written notice of its denying an application for a use permit) by seizing upon the timing of Ferndale's explanatory meeting minutes. Thus, the majority has characterized Ferndale's justification as "impermissible" because, like the defendant in *Virginia Metronet*, the BZA "submitt[ed] reasons after a challenge [was] mounted," thereby evading "substantive review, contrary to Congressional intent." *Virginia Metronet*, 984 F.Supp. at 973.

*The majority's reliance on Virginia Metronet, a Fourth Circuit district court decision which has no precedential significance in this circuit, is misplaced. That decision conflicts with the facts of the case sub judice and the Sixth Circuit's existing precedent.* First, the district court's opinion in *Virginia Metronet*, misinterprets the Act by concluding that the defendant's letter of explanation evaded substantive review, because the city drafted it more than thirty days after the letter of denial. Under the Act, the plaintiff had a thirty day statute of limitations in which to appeal a zoning board's "final action." However, a district court's decision, within this circuit, has decided that no "final action" ensues until the municipality issues a written explanation for its action. *Omnipoint Holdings, Inc. v. City of Southfield*, 203 F.Supp.2d 804 (E.D. Michigan 2002) (noting that *Virginia Metronet* incorrectly assumed the "final action" triggering the

---

**6.** The relevant portion of 47 U.S.C. § 332(c)(7)(B)(v) reads as follows:

(B) Limitations
. . .
(v) Any person adversely affected by any final action . . . by a State or local government or instrumentality thereof that is inconsistent with this subparagraph may, within 30 days . . . commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis . . .

**7.** The timing of the letter of explanation concerned the court in *Virginia Metronet* only because, in the court's interpretation of the Act, it bore on the statute of limitations: "As [the Act] requires that any challenge to a decision be brought within thirty days, allowing Defendant to wait until the limitations period has expired to provide reasons for their action is to effectively preclude review of those decisions, contrary to Congressional intent." *Virginia Metronet* at 973, n. 9.

statute of limitations was the denial of the application itself, rather than a written explanation of the Board's reasons). Thus, there exists "no opportunity for a municipal entity to deny an aggrieved party her day in court by waiting more than thirty (30) days before issuing a written decision explaining the reasons for denying a request." *Id.* at 813 (needless to note that an opinion of a district court within this circuit is not precedent for this appellate review); *see also Industrial Communications and Electronics, Inc. v. Town of Falmouth,* No. 98–397–P–H, 1999 WL 33117159, at *3 (D.Me. June 10, 1999) (explaining that there can be no final action by the local permitting body until there is a written decision); *Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Bd.,* No. 98–3299, 1998 WL 764762, at *3–4 (E.D.Pa. Oct. 28, 1998) (finding no "final action" until the zoning board served its decision upon the plaintiff).

Indeed, in denying Ferndale's motion for summary judgment, the district court in the instant case foreclosed the possibility of a municipality evading substantive review by finding that the statute of limitations would not begin to accrue until the applicant had received written notice of the reasons for denial of the requested "use variance." *Laurence Wolf Capital Management Trust v. City of Ferndale,* 176 F.Supp.2d 725, 727–728 (E.D. Michi-

gan 2000) (defining "final action" under the Act as requiring a municipality to provide enough explanation for its action to enable a reviewing court to assess the merits of the decision). The district court's reasoning, in the instant case, is entirely consonant with this circuit's recent decision in *New Par,* in which this court resolved that to meet the Act's "in writing" requirement necessitated a municipality provide "a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons." *New Par v. City of Saginaw,* 301 F.3d 390, 396 (6th Cir.2002). As *New Par* concluded, without a sufficient explanation from the municipality no record existed for review and evaluation. Thus, it would be premature to declare a "final action" had occurred absent a record of evidence.

Moreover, the *Virginia Metronet* court's concern for substantive review does not attach to the instant case. Unlike defendant in *Virginia Metronet,* Ferndale provided reasons for its decision in response to a state court's order of remand for directing such an explanation, in line with Michigan's Administrative Procedures Act. M.C.L. § 24.306. Rather than evading substantive review, Ferndale's explanation created the opportunity for an examination by the district court after Wolf instituted the instant suit.[8]

---

**8.** Applicable to the case *sub judice.* Michigan's Planning. Housing and Zoning Township Act. M.C.L. § 125.293, provides wide latitude for the judicial review of decisions by a municipality's zoning board of appeals:

(1) The decision of the board of appeals rendered pursuant to section 23 shall be final. However, a person having an interest affected by the zoning ordinance may appeal to the circuit court. Upon appeal the circuit court shall review the record and decision of the board of appeals to insure that the decision:

(a) Complies with the constitution and laws of the state.
(b) Is based upon proper procedure.
(c) Is supported by competent, material, and substantial evidence on the record.
(d) Represents the reasonable exercise of discretion granted by law to the board of appeals.
(2) *If the court finds the record of the board of appeals inadequate to make the review required by this section, or that there is additional evidence which is material and with good reason was not presented to the board of appeals, the court shall order fur-*

Finally, unlike *Virginia Metronet.* Ferndale's reasoned explanation was neither *pro forma* nor summarily conclusive.[9] *The Board itself, and not a city employee as in Virginia Metronet, deliberated upon, and then delineated five reasons for denying AWS' application.* These reasons demonstrate AWS' *requirement to carry its burden to prove* an "undue hardship" to overcome the Board's denial of its application for a "use variance."

The majority erroneously rationalizes that, even if Ferndale's explanation satisfied the "in writing" requirement, it failed to provide the substantive evidence necessary under the Act to deny AWS' application. The opinion arrives at this unsupported conclusion by finding that, because Wolf's building already had a cellular tower on its roof, AWS' application *should* have been for a "nonconforming use variance" rather than the requested "use variance." Applying for a "nonconforming use variance" advantageously places a lesser burden of proof on the petitioner, requir-

ing only that a municipality's denial pose a "practical difficulty." On the other hand, an applicant for a "use variance" must prove the more demanding burden of "undue hardship," including evidence that the property is uniquely suited for the construction. *Unfortunately, the majority's reasoning comports with neither the law of the circuit nor the facts of the instant case.*

*The majority concedes that both parties stipulated in their Joint Pre–Trial Statement that AWS made an application for a "use variance."*[10] However, the opinion urges that its commitment to abide by those stipulated facts is an "argument [that] places form over substance." Ironically, in endorsing substance, the majority cites to no authority to support its conclusory argument. *Instead, it obfuscates its position by disregarding the stipulated facts and asserting that AWS' efforts to construct a second wireless tower actually amounted to a "nonconforming use vari-*

---

ther proceedings before the board of appeals on conditions which the court considers proper. The board of appeals may modify its findings and decision as a result of the new proceedings, or may affirm its original decision. The supplementary record and decision shall be filed with the court.

(3) As a result of the review required by this section, the court may affirm, reverse, or modify the decision of the board of appeals.

M.C.L. § 125.293a:

Following the majority's lead with regard to an "impermissible retroactive cure," the practical effect will be to render null and void a party's response to judicial remand in violation of state statute. *See also, Schadewald v. Brule,* 225 Mich.App. 26, 570 N.W.2d 788 (1997) (finding that if the record of the Board's proceedings is inadequate the proper remedy is to remand for further proceeding before the Board, relying on M.C.L. §§ 125.293a(2)).

9. As the court in *Virginia Metronet* commented, "[t]his letter was prepared signifi-

cantly after the actual event, by an individual who did not vote on the decision. In fact, there is no indication in the minutes that [the employee] was even present at the meeting." *Virginia Metronet* at 973. In the instant case, only the timing is at issue in the majority's consideration. Yet, timing is not an issue when, along with the district court, this court recognizes that the statute of limitations would not begin to accrue until Ferndale's BZA submitted in writing the necessary explanation for its denial of AWS' application.

10. AT&T Wireless Communication sought a "use variance" for constructing the telecommunications tower on plaintiff's building from the point in time of its initial application on October 26, 1999. In their December 5, 2000, Joint Pre–Trial Statement, both parties stipulated to the fact that:

> G. AT&T made application to the City of Ferndale for the permitting and a use variance required to construct and activate the said wireless communication antenna facility at the Building.

J.A. at 288.

*ance.*" The district court accepted the stipulation of the parties and considered the case accordingly. *Varga v. Rockwell Intern. Corp.,* 242 F.3d 693 (6th Cir.2001) (explaining that stipulations voluntarily entered by the parties are binding, both on the district court and on the Court of Appeals); *accord Unicore, Inc. v. Tennessee Valley Authority,* 768 F.2d 109 (6th Cir.1985); *Morelock v. NCR Corp.,* 586 F.2d 1096, (6th Cir.1978), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979) (noting that under federal law, stipulations and admissions in pleadings are generally binding on the parties and the Court). *See also City of Troy v. Papadelis,* 226 Mich.App. 90, 572 N.W.2d 246 (1997) (finding stipulation that business operation was a legal nonconforming use must be given full force and effect and could not be set aside).

This court explained the rationale for requiring such an allegiance to the stipulated facts in *Federal Deposit Insurance Corporation v. St. Paul Fire and Marine Insurance Company,* 942 F.2d 1032 (6th Cir.1991):

> Stipulations serve the purpose of conserving judicial resources and allowing the parties to focus on truly disputed issues, everyone benefits when parties agree to make stipulation. It saves the parties the time and money of proving facts that are not in dispute but that are nonetheless necessary to the outcome of the dispute. It saves time and energy for judges and juries who don't have to hear evidence about what the parties are willing to agree about. And it saves the public money, by making trials shorter and clearing space on the docket. In

order for this system to work, however, the parties must be able to depend on the stipulations. If a . . . judge can, as here ignore a clear stipulation of the parties, the incentive to enter stipulations is eliminated. Worse yet, it offers a whole new ground for strategic behavior, as parties can try to get the trier of fact to pass on matters that have already been agreed to.

*Id.* at 1038.

However, even if this court were free to disregard the stipulated facts, the majority's treatment of AWS' request as a "nonconforming use" misinterprets Michigan law. The opinion has asserted that, because the plaintiff already had a nonconforming cellular tower on its roof, the addition of another tower merely expanded that "nonconforming use." Several difficulties arise from that position. First, Michigan law strictly construes zoning regulations prohibiting extension or enlargement of nonconforming uses. *See Reenders v. Parker,* 217 Mich.App. 373, 551 N.W.2d 474 (1996); *City of Troy v. Papadelis,* 226 Mich.App. 90, 572 N.W.2d 246 (1997); *Norton Shores v. Carr,* 81 Mich. App. 715, 265 N.W.2d 802 (1978) (observing that "[g]enerally speaking, non conforming uses may not expand"). In the instant case, Ferndale's ordinance has strictly construed this policy, disallowing the expansion of nonconforming uses.[11]

Moreover, consonant with the strict construal of "nonconforming use," Michigan law has determined that a "non-conforming use is restricted to the area that was non-conforming at the time the ordinance was enacted." *Commerce Township v. Rayberg,* 5 Mich.App. 554, 147 N.W.2d 453

---

**11.** Section 4.39(j)(1) of Ferndale's zoning ordinance strictly disallows expansion of nonconforming uses:

> (1) *Nonexpansion of nonconforming uses.* Towers that are constructed, and anten-

nas that are installed, in accordance with the provisions of this section shall not be deemed to constitute the expansion of a nonconforming use or structure.

(1967), *relying on Patchak v. Township of Lansing*, 361 Mich. 489, 105 N.W.2d 406 (1960). Here again both, as the parties have stipulated, the nonconforming use at the time of the enactment of Ferndale's Zoning Ordinance was the sole wireless Air Touch tower atop Wolf's building. *Thus, under Michigan law, Wolf had a vested right in only the use of the single, existing nonconforming tower. Contrary to the majority's position, Wolf does not possess a right to build, upon another area of its property, a second, separate, nonconforming tower. See Heath Township v. Sall*, 442 Mich. 434, 502 N.W.2d 627 (1993) (finding prior nonconforming use a vested right).

This position is affirmed by a review of the *sole* authority upon which the panel majority rests its claim that AWS actually sought a "nonconforming use" variance. In *Century Cellunet of Southern Michigan Cellular, Ltd. v. Summit Township*, 250 Mich.App. 543, 655 N.W.2d 245 (2002), the petitioner sought the township's permission to replace six existing antennas on a nonconforming telecommunications tower with smaller and more powerful antennas and to install three additional antennas on the tower. The zoning board correctly treated petitioner's application as a request to expand a "nonconforming use" and the court agreed. The petitioner's request, in *Century Cellunet*, to add three new antennas to its tower array, has convinced the majority, in the case *sub judice*, that AWS' request to build a new tower should have been treated as a "nonconforming use" variance. But, *Century Cellunet* is a "nonconforming use" case for precisely the reason that the instant case is not. In *Century Cellunet*, the petitioner sought a structural alteration of its preexisting tower, whereas the case at hand involved AWS' application for the construction of a new tower in a new location on Wolf's property. *See also, Industrial Communications and Electronics, Inc. v. Town of Falmouth*, 2000 WL 761002 (D.Me.2000) (holding that construction of new telecommunications towers in new locations require a use variance even when nonconforming towers present).

Accordingly, this court should affirm the district court's disposition.